**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA**

| | |
|---|---|
| FIRST CITY BANK OF FLORIDA, | |
| *Plaintiff,* | 2017 cv   2:17-cv-41-MHT |
| v. | |
| WILLIAM R. MCKELVY; A & CH PROPERTIES, LLC; BANCORPSOUTH BANK; BEACH METALS OF NAVARRE, INC.; BLACKWATER SETTLEMENT SOLUTIONS, LLC., *f/k/a* BLACKWATER OIL & GAS, LLC; CHAIM HERSHKOWITS; CRAIG F. SHAW; CRYSTAL MCKELVY; EASTERN METALS OF CRESTVIEW, INC.; GENERATION FIVE FINANCIAL GROUP, LLC; GENERATION FIVE FINANCIAL GROUP OF FLORIDA, LLC; GREEN ENERGY DEVELOPMENT GROUP, LLC; HCB FINANCIAL CORP.; JAMES DENNIS MCKELVY, individually and as sponsor for JAMES THOMAS MCKELVY AND ADDISON MCKELVY; JANET F. MCKELVY; JMW OF ANDALUSIA LLC; JOHN H. KINCEY, JR.; JOHN MICHAEL WARD; NORTH OKALOOSA DEVELOPMENT CORPORATION; PHILLIPS CAPITAL PARTNERS, INC.; PRECIOUS METALS OF BAKER, INC.; RUPERT E. PHILLIPS; AND SQUARE DONUT GROUP INC. *f/k/a* D SQUARE DONUTS; JANE DOES 1-10; and JOHN DOE COMPANIES 1-10, | DEBRA P. HACKETT, CLK U.S. DISTRICT COURT MIDDLE DISTRICT ALA 2017 JAN 20 P 2: 06 RECEIVED |
| *Defendants.* | |

1

## VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff First City Bank of Florida , a Florida state bank ("Plaintiff"), brings this Verified Complaint against Defendants, William R. McKelvy ("Bill McKelvy") A & CH Properties, LLC ("A&CH LLC"); BancorpSouth Bank ("BancorpSouth"); Beach Metals of Navarre, Inc. ("Beach Metals"); Blackwater Settlement Solutions, LLC, *f/k/a* Blackwater Oil & Gas, LLC ("Blackwater"); Chaim Hershkowits; Craig F. Shaw ("Craig Shaw"); Crystal McKelvy; Eastern Metals of Crestview, Inc. ("Eastern Metals"); Generation Five Financial Group, LLC ("GenFive"); Generation Five Financial Group of Florida, LLC ("GFFG Florida"); Green Energy Development Group, LLC ("Green Energy"); HCB Financial Corp. ("HCB Financial"); James Dennis McKelvy ("Dennis McKelvy"), individually and as sponsor for James Thomas McKelvy and Addison McKelvy; Janet F. McKelvy ("Janet McKelvy"); JMW of Andalusia LLC ("JMW of Andalusia"); John H. Kincey, Jr. ("Johnny Kincey"); John Michael Ward ("Mike Ward"); North Okaloosa Development Corporation ("NO Development"); Phillips Capital Partners, Inc. ("Phillips Capital"); Precious Metals of Baker, Inc. ("Precious Metals"); Rupert E. Phillips ("Rupert Phillips"); Square Donut Group Inc. *f/k/a* D Square Donuts ("Square Donut"); Jane Does 1-10; and John Doe companies 1-10 (collectively, "Defendants"), and alleges as follows:

## NATURE OF ACTION AND INTRODUCTION

1.      Plaintiff brings this action—pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(a), 1962(b); and 1962(c), *et seq.*; the Uniform Fraudulent Transfers Act, as enacted in Alabama in Ala. Code 1975 § 8-9A-1 *et seq.* (the "AUFTA"); and the common law of the State of Alabama—for the recovery of several million

2

dollars in cash and corporate interests fraudulently transferred to and from judgment debtors Bill and Janet McKelvy (husband and wife) and their alter ego, GenFive, their family members and friends, and certain related entities.[1]  In addition, Plaintiff seeks damages from other Defendants and co-conspirators including certain family members of Bill and Janet McKelvy, and certain business partners of Bill and Janet McKelvy, including Johnny Kincey, BancorpSouth, Chaim Hershkovitz, Mike Ward, Craig Shaw and Rupert Phillips, and certain entities related to Johnny Kincey, Chaim Hershkovitz, Mike Ward, Craig Shaw and Rupert Phillips.

2.     As detailed below, Bill and Janet McKelvy have orchestrated a scheme to conceal assets from legitimate creditors by funneling them into GenFive (which neither of them own) and then sending them out of the country.  In addition to involving numerous fraudulent transfers (the "Fraudulent Transfers")[2] orchestrated over a number of years, this case also arises from a massive conspiracy by and among Defendants to defraud Plaintiff and other creditors of Bill and Janet McKelvy.  Defendants planned and accomplished this conspiracy through the ongoing use of unlawful activity, including, *inter alia*, wire fraud, mail

---

[1]     Plaintiff also holds a judgment against Dennis McKelvy. Dennis McKelvy filed a petition for relief under Chapter 7 on March 31, 2014, in the United States Bankruptcy Court for the Middle District of Alabama, Case No. 14-80395.  The Bankruptcy Court entered an Order of Discharge on October 21, 2014.  Plaintiff timely filed a Complaint to revoke the discharge Order.  The trial of that Adversary Proceeding began on December 16, 2016, and is scheduled for completion on February 2, 2016, Adversary No. 15-08051.  Based on facts and evidence not known to Plaintiff until 2015, Plaintiff believes that Bill, Janet and Dennis McKelvy conspired over a period of years to defraud their creditors through the formation and use of various entities designed solely to shield real property, personal property and large amounts of cash.  The use of Dennis McKelvy's own children as components in the scheme was central to its operation.  Accordingly, Plaintiff claims for damages against Dennis McKelvy in this Complaint refer only to his actions after October 21, 2014.  Plaintiff reserves the right to broaden the scope of its claims to the extent that the Bankruptcy Court revokes Dennis McKelvy's discharge.

[2]     The Fraudulent Transfers refer collectively to all of the illegitimate transfers of cash, assets, money and interests, including deposits into or withdrawals out of Defendants' and Defendants' entities' banking accounts, including GenFive, Blackwater and JMW of Andalusia, as discussed herein, encompassing the GenFive Deposit Transfers, GenFive Cash Withdrawals, GenFive Check Transfers, Blackwater Transfers, and JMW Transfers (each as defined herein).

3

fraud, money laundering, and other indictable offenses. As a result of the ongoing scheme, Plaintiff has been deprived from the collection of millions of dollars to which it is entitled, and it has been forced to incur substantial fees and costs related to its collection efforts.

I.    **Bill and Janet McKelvy Use GenFive to Hide Their Assets.**

3.    Bill and Janet McKelvy amassed substantial wealth in a variety of businesses from the 1980s through the mid-2000s. At the height of their personal wealth, Bill McKelvy claimed to have held over $12 million in cash located in their original mansion in Baker, Florida.

4.    However, as a developer and real estate investor prior to the recession beginning in 2008, Bill McKelvy faced millions of dollars in personal liability. At the same time, most, if not all, of his real estate investments were backed by personal liability, and were rapidly decreasing in value. Similarly, Janet McKelvy, also a successful businesswoman, also faced millions of dollars in contingent liabilities related to real estate transactions.

5.    As a means to hide their assets from their creditors, Bill and Janet McKelvy set up JTA during the recession with the direct assistance of their son, Dennis McKelvy. After one or more of their creditors identified JTA and its bank account, Bill and Janet McKelvy knew they needed to create a new account and a new entity in which to place their assets outside of their direct ownership.

6.    In or about August 2009, longtime friend Johnny Kincey began his employment with BancorpSouth. Johnny Kincey was formerly in business with Bill McKelvy; the two owned and operated Whitetail Land & Management, Inc., for several years until Mr. Kincey

ultimately returned to banking in 2009. Trusting Johnny Kincey to support the scheme, Bill and Janet McKelvy started banking with BancorpSouth.

7.     In 2010 and 2011, Plaintiff obtained three judgments against Bill and Janet McKelvy totaling over $4,000,000. Sometime in 2011, Bill and Janet McKelvy moved to Andalusia, Alabama. Months after Plaintiff obtained the first judgment against Bill McKelvy, on or about December 27, 2010, Bill and Janet McKelvy directed their attorney (Richard McBride) to form GenFive, but made their grandchildren the *de facto* owners, specifically directing Richard McBride to maintain the anonymity of Bill and Janet McKelvy in forming the entity.

8.     GenFive was formed in the same way that JTA, *i.e.*, to hide any reference to the McKelvy family in public documents. With respect to both entities, Bill and Janet McKelvy instructed Richard McBride to remain as the registered agent so that their identities could remain anonymous as a matter of public record.

9.     Shortly thereafter, JTA (among other entities) commenced transferring significant assets to GenFive (always deposited at the Auburn BancorpSouth branch which was approximately 50 miles away from their home in Andalusia), with such assets valued at over $1 million within the first year of its formation.

10.    Following GenFive's formation, Bill, Janet and Dennis McKelvy coordinated the opening of a new bank account for GenFive. At the time, Bill and Janet McKelvy resided in Andalusia, Alabama. Johnny Kincey opened the bank account at BancorpSouth at its East Glenn Avenue location in Auburn, Alabama. Dennis McKelvy signed the original account documents for the GenFive account, naming himself and Bill and Janet McKelvy as

signatories. Since then, the signatories have been changed by Dennis McKelvy three times, with him being the only person to maintain authority throughout the account's existence.

11.    In 2012, Bill McKelvy created a new business, completely separate from his prior real estate ventures.   Determining that substantial money could be obtained by processing claims related to the Deepwater Horizon oil spill in the Gulf of Mexico (which occurred in April 2010), Bill McKelvy began operating a business in Crestview, Florida to process and submit claims.   To assist with operating the business, Bill McKelvy recruited two old friends, Mike Ward and Craig Shaw, to provide additional business contacts.

12.    Bill McKelvy acknowledged that he initiated and came up with the idea behind this business and set-up the initial structure to acquire and process settlement claims against BP.   To start the business, Bill McKelvy and his business partners utilized an entity they previously formed on April 19, 2011—Blackwater.

13.    Rather than include himself as a member, partner or owner of Blackwater, Bill McKelvy gave his ownership interest to GenFive—like he did with all of his assets after December 2010.   In the course of operating Blackwater, Bill McKelvy directed both Mike Ward and Craig Shaw to issue checks to GenFive (rather than to himself).   At one point, Bill McKelvy directed Craig Shaw to execute a series of checks to allow for Bill McKelvy to transfer Blackwater funds to GenFive without Bill McKelvy himself signing the checks.   Craig Shaw never inquired as to why he was signing blank checks, and GenFive never provided any consideration or value to Blackwater in exchange for its ownership interests.   Rather, Bill McKelvy was the individual responsible for operating Blackwater and generating many of the

6

"leads" with law firms, accounting firms, and other parties that led Blackwater to process numerous Deepwater Horizon claims.

14.    As a result of these efforts, Blackwater fraudulently transferred $792,526 to GenFive (the "Blackwater Transfers").    Again, Bill and Janet McKelvy deposited the Blackwater checks in-person in the GenFive Account (as defined below), in person, at an Auburn, Alabama BancorpSouth location 50 miles away from their home, often withdrawing these sums directly (on the same day or in the same week or month) in cash.

15.    In addition to receiving funds from Blackwater, Bill McKelvy also received substantial funds from his business partner Rupert Phillips and entities owned, controlled or directed by Rupert Phillips. Rupert Phillips—through Phillips Capital, HCB Financial, Green Energy, and Paradise Liquors of the Emerald Coast (an entity unrelated to Rupert Phillips that allegedly owed him or his businesses certain amount of money)—directed the transfer of $200,000 to GenFive. Rupert Phillips made and directed these transfers at the request of Bill and Janet McKelvy.

16.    Despite claiming that these funds represented "gifts" to Bill McKelvy, on information and belief, Rupert Phillips made and directed these transfers in furtherance of Bill and Janet McKelvys' scheme to make unlawful foreign investments and acquire counterfeit money. Rupert Phillips himself admitted that he knew about the foreign investment scheme.

## II.    Bill and Janet McKelvy Direct Withdrawals of Cash From the GenFive Account to Fund Unlawful Investments.

17.    Even more alarming than the millions of dollars of deposits transferred to GenFive, is the fact that shortly after deposits were made into the GenFive Account, Bill and Janet McKelvy drove approximately 50 miles to the Greenville BancorpSouth branch to

withdraw the money in cash increments under $10,000. Bill and Janet McKelvy would sometimes make multiple trips in a single week to allow them to withdraw significant amounts of cash. Over the years, Bill and Janet McKelvy have made hundreds of these trips to withdraw cash.

18.    Defendants, through Bill and Janet McKelvy, structured such cash withdrawals to be made in amounts less than $10,000 to avoid reporting requirements under federal law. Indeed, Bill McKelvy, and several of Defendants, including Rupert Phillips, Johnny Kincey, BancorpSouth and Dennis McKelvy, acknowledged their understanding of the anti-structuring provisions under federal law.

19.    For the period from August 5, 2011 to January 19, 2016, Bill, Janet and Dennis McKelvy withdrew over $1,363,180 through checks written to "cash." Dennis McKelvy signed (or allowed Bill McKelvy to "stamp" his signature) on hundreds of checks drawn on the GenFive Account. As both Bill McKelvy and Dennis McKelvy testified, much of this cash was used to fund a gold-mining project in the Philippines and, on information and belief, the acquisition of counterfeit currency and other unlawful or illegal materials. On information and belief, none of the Defendants ever reported any of these acquisitions or transactions. These unreported foreign investments, and the acquisition of counterfeit currency and other illegal materials, violate applicable law.

20.    To insulate these various transfers and assets from their creditors, Bill and Janet McKelvy—with the assistance of Defendants including Dennis McKelvy—attempted to transfer ownership of their assets to their grandchildren. They did so by forming both JTA and GenFive in custodial formats, making their grandchildren owners and identifying others

8

as their custodians. If they were true owners, the grandchildren's receipt of such value and income would create tax liability. According to Crystal McKelvy (wife of Dennis McKelvy), her children James Thomas McKelvy and Addison McKelvy—grandchildren of Bill McKelvy—never received any money from GenFive. According to Rob Sconiers, and Sarah Tinklepaugh (non-McKelvy custodians of GenFive), there has never been any reporting, business activity or communication regarding the entities.

21.    On information and belief, Bill and Janet McKelvy and other Defendants have engaged in tax fraud with respect to several of the transfers described herein. On information and belief, Bill and Janet McKelvy specifically engaged in tax fraud by purporting to transfer assets to their grandchildren, but actually keeping them for themselves. On information and belief, Bill McKelvy, Janet McKelvy and their grandchildren have not reported taxable income or paid any associated income tax related to the assets/income earned through GenFive. On information and belief, certain Defendants have engaged in additional tax fraud by failing to pay taxes for earnings from entities in which they had an interest (that were subsequently transferred to GenFive, among other entities). [3]

## III.    Bill and Janet McKelvy Direct the Acquisition of a Judgment to Further Protect Their Fraudulent Scheme.

22.    In addition to fraudulently transferring their assets and engaging in a scheme to make unlawful investments, Bill and Janet McKelvy also orchestrated and conspired, through Rupert Phillips (a longtime friend), HCB Financial (an entity controlled by Rupert Phillips in which Bill McKelvy was a one-time owner and investor), Crystal McKelvy (their daughter-in-

---

[7]    Failing to report foreign income in violation of Internal Revenue Code §§ 6723 and 6672, and the intent to evade federal and state income taxes, violating, among other laws, I.R.C. §§ 6700, 7201, 7203, and 7207.

368429.19

law), Johnny Kincey and BancorpSouth, in the acquisition of a $3.3 million judgment from creditor CCB Community Bank, *f/k/a* Covington County Bank, an Alabama banking corporation ("CCB").

23.     To facilitate the acquisition of the judgment and to create the impression that he had no assets to satisfy CCB, Bill and Janet McKelvy directed Crystal McKelvy to borrow funds from BancorpSouth to partially satisfy CCB in connection with CCB's sale of the CCB Judgment (as defined herein) to Rupert Phillips and HCB Financial. On information and belief, Phillips Capital provided the funding to allow HCB Financial to acquire the CCB Judgment.

24.     On information and belief, neither Rupert Phillips nor HCB Financial had any intention to collect on the claims or judgments that they purchased at the request of Bill and Janet McKelvy. On information and belief, Bill and Janet McKelvy directed these friendly parties—Rupert Phillips and HCB Financial—to acquire these judgments in an attempt to acquire the judgment liens against Bill McKelvy's remaining assets in hopes of further blocking their legitimate creditors from recovering on or otherwise enforcing their rights.

25.     Accordingly, any transfers "satisfying" HCB Financial or Rupert Phillips and any liens obtained by these judgment creditors against Bill and Janet McKelvy or their assets should be avoided as fraudulent transfers made with the actual intent to hinder, delay, or defraud Bill and Janet McKelvys' present and future arm's length creditors.

26.     In sum, unbeknownst to Plaintiff, Defendants have devised and implemented an intentional, orchestrated scheme to transfer, conceal, and otherwise hide Bill and Janet McKelvys' assets for the purpose of ensuring that such assets: (a) would not be available to

satisfy lawful claims against Bill and Janet McKelvy (including Plaintiff's judgments), but rather would be available for the personal use and enjoyment of those individuals and their family members; and (b) allow Bill and Janet McKelvy and their other business partners to make unlawful investments in and otherwise obtain, among other things, a Philippines gold mine and counterfeit currency. Such scheme involved the deposit and withdrawal of hundreds of thousands of dollars and the use of otherwise legitimate businesses for purposes of diverting funds that otherwise would be available for collection. Defendants undertook their scheme, which has spanned more than three years and remains ongoing, through a series of orchestrated illegal acts.

27.     This action is brought to recover those assets held by Defendants that are necessary to satisfy Plaintiff's judgments—assets which Bill and Janet McKelvy unlawfully concealed with the knowing participation and aid of the individual Defendant co-conspirators. This concealment occurred through ongoing and concerted illegal acts, including, *inter alia*, mail fraud, wire fraud, financial institution fraud, and obstruction of justice in a scheme to defraud Plaintiff through a pattern of racketeering activity by moving and funneling the assets through a myriad of corporate entities and accounts (both domestic and foreign). As a result of such unlawful acts, Plaintiff has not recovered any amounts owed pursuant to its judgments, and it has incurred other damages as a direct and proximate result of the allegations herein.

## THE PARTIES

28.     Plaintiff is a Florida state chartered bank whose principal place of business and corporate headquarters are located at 135 Perry Avenue SE in Fort Walton Beach, Florida.

368429.19

29.     On information and belief, Bill McKelvy is an individual, and at all relevant times herein, a resident of Covington County, Alabama, at 121 Thames Street, Andalusia, Alabama 36420.

30.     A&CH LLC is a Florida limited liability company, with its principal place of business at 960 East Highway 98, Unit 102, Destin, Florida 32541, and was formed by Chaim Hershkowits. On information and belief, A&CH LLC conducts business in Alabama.

31.     BancorpSouth is a Mississippi Bank headquartered in Tupelo, Mississippi, with branches located in Auburn, Alabama (Lee County) and Greenville, Alabama (Butler County). BancorpSouth conducts business in Alabama, specifically in Lee, Montgomery, Covington, and Butler Counties.

32.     On information and belief, Beach Metals is a Florida corporation, with its principal place of business at 296 South Ferdon Blvd., Crestview, Florida, 32536, and was formed by Mike Ward but, on information and belief, actually operated and directed by Bill and Janet McKelvy. On information and belief, Beach Metals conducts business in Alabama.

33.     On information and belief, Blackwater is a Florida limited liability company, with its principal place of business at 296 South Ferdon Blvd, Crestview, Florida 32531, and was formed and controlled by Bill McKelvy. On information and belief, Blackwater conducts business in Alabama, including in Lee and Covington Counties.

34.     On information and belief, Chaim Hershkowits is an individual, and friend of Bill and Janet McKelvy, who resides at 4638 Windstarr Drive, Destin, Florida 32541-4765, Okaloosa County. On information and belief, Chaim Hershkowits regularly conducts business in Florida and Alabama.

368429.19

35.     On information and belief, Craig Shaw is an individual, and friend of Bill and Janet McKelvy, who resides at 2410 Moonstone Drive, Crestview, Okaloosa County, Florida. On information and belief, Craig Shaw regularly conducts business in Alabama, and he holds interests in real property in Alabama.

36.     On information and belief, Crystal McKelvy is an individual, wife of Dennis McKelvy, and mother of James Thomas and Addison McKelvy, and resides in Lee County, Alabama, at 787 Tacoma Drive in Auburn, Alabama 36830-3441.

37.     On information and belief, Eastern Metals is a Florida corporation, with its principal place of business at 296 South Ferdon Blvd., Crestview, Florida, 32536, and was formed by Bill McKelvy and Chaim Hershkowits. On information and belief, Eastern Metals conducts business in Alabama.

38.     On information and belief, GenFive is an Alabama limited liability company formed in December 2010, whose principal place of business is either in Montgomery, Covington or Lee County, Alabama, and registered office is at 184 Commerce Street, Montgomery, Alabama 36104.

39.     On information and belief, GFFG Florida is a Florida limited liability company formed in December 2012, whose mailing address is located in Covington County, Alabama, P.O. Box 279, Andalusia, Alabama 36420, and is managed by Mike Ward. On information and belief, GFFG owns real property located in the State of Alabama and conducts business in the State of Alabama.

40.     On information and belief, Green Energy is a Florida limited liability company having its principal place of business at 42 Business Centre Drive, Suite 101, Miramar Beach,

Florida, 32550, and is controlled by Rupert Phillips. On information and belief, Green Energy conducts business in Alabama.

41. On information and belief, HCB Financial is a Florida corporation having its principal place of business at 42 Business Centre Drive, Suite 101, Miramar Beach, Florida, 32550, and is controlled by Rupert Phillips. On information and belief, HCB Financial conducts business in Alabama.

42. On information and belief, Dennis McKelvy is an individual, son of Bill and Janet McKelvy, father of James Thomas and Addison McKelvy, and resident of Lee County, Alabama, at 787 Tacoma Drive in Auburn, Alabama 36830-3441.

43. On information and belief, Janet McKelvy, Bill McKelvy's wife, is an individual and a resident of Covington County, Alabama, at 121 Thames Street, Andalusia, Alabama 36420.

44. On information and belief, JMW of Andalusia is a Florida limited liability company, with its principal place of business at 296 South Ferdon Blvd., Crestview, Florida, 32536. On information and belief, Mike Ward formed JMW of Andalusia, but it is operated and directed by Bill and Janet McKelvy. On information and belief, JMW of Andalusia conducts business in Alabama.

45. On information and belief, Johnny Kincey is an individual, friend of Bill and Janet McKelvy, and resident of Lee County, Alabama, and resides at 1840 South Sagewood Ct., Auburn, Alabama 36830-7230.

46.     On information and belief, Mike Ward is an individual, friend of Bill and Janet McKelvy, and resides at 4973 Soundside Drive, Gulf Breeze, Florida 32563-8919.   On information and belief, Mike Ward regularly conducts business in Alabama.

47.     On information and belief, NO Development is a Florida corporation, with its principal place of business at 223 E. Flagler Street, Miami, Florida 33131, and was formed by Bill McKelvy. On information and belief, NO Development conducts business in Alabama.

48.     On information and belief, Phillips Capital Partners is a Florida corporation with is principal place of business at 42 Business Centre Drive, Suite 101, Miramar Beach, Florida, 32550. On information and belief, Phillips Capital conducts business in Alabama.

49.     On information and belief, Precious Metals is a Florida corporation, with its principal place of business at 296 South Ferdon Blvd., Crestview, Florida, 32536. On information and belief, Mike Ward formed Precious Metals, but it is operated and directed by Bill and Janet McKelvy.  On information and belief, Precious Metals conducts business in Alabama.

50.     On information and belief, Rupert Phillips is an individual and friend of Bill and Janet McKelvy, who resides at 66 North Holiday Road, Miramar Beach, Florida 32550-6936. On information and belief, Rupert Phillips regularly conducts business in Alabama.

51.     On information and belief, Square Donut is a corporation incorporated in the State of Alabama, Lee County, formed on March 24, 2009, with its registered mailing address as 1625 East University Drive, Suite 116, Auburn, Alabama 36830.

52.     On information and belief, Defendants Jane Does 1-10 are yet to be identified as members, directors, trustees, and/or managing members of the Defendant entities, and/or

officers, employees, agents, co-conspirators, and/or aiders and abettors of Defendants, which

have been at all relevant times individuals with authority to control the conduct of Defendant

entities, and as such have conspired to commit the wrongful acts alleged herein and are jointly

and/or severally liable for the wrongful acts alleged herein. Upon further discovery, Plaintiff

will seek to amend this Complaint to state the true names and capacities of these Defendants

when the relevant information has been obtained.

53.     On information and belief, Defendants John Doe Companies 1-10 are yet to be

identified as other shell entities, incorporated in the United States, and used by Defendants, in

their RICO scheme, which have been formed under a variety of company names to act as alter

egos, controlled subsidiaries, co-conspirators, and/or aiders and abettors of Defendants, and

as such have participated in the wrongful acts alleged herein and are jointly and/or severally

liable for the wrongful acts alleged herein.  Upon further discovery, Plaintiff will seek to amend

this Complaint to state the true names and capacities of these Defendants when the relevant

information has been obtained.

## VENUE AND JURISDICTION

54.     The acts alleged herein that give rise to the claims contained in this Complaint

primarily occurred in, or originated from Montgomery County, Alabama.

55.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

because this case presents a federal question by alleging violations of, and conspiracy to violate,

the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*

56.     This Court also has supplemental jurisdiction over the state-law claims pursuant

to 18 U.S.C. § 1367 because the state-law claims asserted herein form part of the same case or

controversy, and the fraudulent and tortious acts alleged herein arise from a common nucleus of operative facts.

57.     This Court has personal jurisdiction over each of the Defendants because each of the Defendants either is a resident of Alabama, has committed intentional tortious acts within and directed towards Alabama, and/or has contracted with residents of Alabama with contracts calling for performance within Alabama.  In addition, Bill and Janet McKelvy and their co-conspirator Defendants directed the subject fraud from, among other places, his home location in Alabama using Alabama corporations.  Defendants accordingly have sufficient contacts with the State of Alabama so as not to offend traditional due process notions of fair play and substantial justice.

58.     Venue is proper in this District pursuant to: (a) 28 U.S.C. § 1391(b) (2), because a substantial part of the events or omissions giving rise to the claims occurred in this District; and (b) 28 U.S.C. § 1391(b) (1) and/or (3), because one or more Defendants are found in this District and there is no other District in which the action may otherwise be brought.

368429.19

## RELEVANT FACTS

## I.    Bill and Janet McKelvys' Extensive Loan Obligations, Personal Guarantees, and Purported Personal Income and Status.

59.    Bill and Janet McKelvy, previously prominent business owners and real estate investors, personally guaranteed millions of dollars in loan obligations to numerous financial institutions.  Indeed, as of January 2008, Bill and Janet McKelvy were obligated for over $10,000,000 in indebtedness.

60.    In connection with their personal guaranties, Bill and Janet McKelvy reported, *inter alia*, various assets described herein to their lenders in order to induce them to loan millions of dollars to them and their various business entities.  Bill and Janet McKelvys' various lenders relied upon their personal guaranties, their alleged assets, and their alleged net worth.

61.    Thomas McKelvy and Addison McKelvy are the children of Dennis and Crystal McKelvy and grandchildren of Bill and Janet McKelvy.

62.    On information and belief, Bill and Janet McKelvy informally "adopted" Sarah Marie Tinklepaugh (*f/k/a* Sarah Sigler) ("Sarah Tinklepaugh") when she was eighteen (18) years old.  For a number of years thereafter, Bill and Janet McKelvy treated her and, eventually, her daughter, Janet Sconiers (named after Janet McKelvy), and, at times, Sarah Tinklepaugh's ex-husband, Rob Sconiers, as members of their family.  After the termination of the relationship between these parties, Bill and Janet McKelvy ceased treating Sarah Tinklepaugh, Janet Sconiers, and Rob Sconiers as members of their family.

63.    Prior to the recession in 2007-2008, and even after, Bill McKelvy has taken much pride in his status as a "cash guy", informing Plaintiff (during testimony given in the

course of Plaintiff seeking to enforce its Judgments) that he once held millions in cash in his safe located in his prior mansion located in Baker, Florida. According to records obtained by Plaintiff, Bill and Janet McKelvys' mansion—located at 5441 Griffith Mill Rd in Baker, Okaloosa County, Florida—was valued at $12 million at one point.

64.     Eventually, Bill McKelvy passed this trait along to his son, Dennis McKelvy, encouraging Dennis to use cash as much as he could in his personal life. Dennis McKelvy acknowledged his father's use and holding of cash, testifying that he has "seen him with like $100,000 in a desk drawer before," and with boxes of cash in a safe.

65.     Since 2008 and notwithstanding their purported personal wealth, Bill and Janet McKelvy have set forth on a purposeful scheme to transfer substantially all of their assets to related entities over which Bill McKelvy retains control. Bill and Janet McKelvy have engaged in this scheme in an effort to conceal and protect their assets from their legitimate creditors, including Plaintiff.

66.     Since 2008, Bill McKelvy claims to have ceased operating any businesses and is effectively "retired." Bill McKelvy has testified that he has no income and that he survives on undocumented "loans and gifts from friends." He has testified that his current living expenses are just over $1,500 per month or over $18,000 per year.

67.     With respect to their personal housing, Bill and Janet McKelvy purportedly reside at a property located in Andalusia, Alabama. On information and belief, Alan and Sue Cotton (personal friends and business associates of Bill and Janet McKelvy) own this property and purportedly lease the property to Bill and Janet McKelvy for no rent or other consideration. Despite "gifting" a home to Bill McKelvy, Alan and Sue Cotton (and their

related entities) have, on information and belief, nonetheless transferred over $68,618.12 to Bill McKelvy (through GenFive) since 2011.

68.     Other than furniture and clothing located in the Andalusia, Alabama house, Bill McKelvy's only other real "asset" in his name is P.O. Box 217 which he maintained in Baker, Florida (the "Baker P.O. Box"). Baker, Florida, is located across state lines, over forty (40) miles from the Andalusia, Alabama house. In addition to Bill and Janet McKelvy, Mike Ward—and entities owned or controlled by Bill McKelvy or Mike Ward, including GenFive, JMW of Andalusia, JTA and Blackwater—use the Baker P.O. Box.

69.     Despite claiming to have no income and no assets, as described below, Bill and Janet McKelvy orchestrated the transfer and withdrawal of over $1,363,180 in cash from a BancorpSouth bank account since 2011.

**II.     Judgments against Bill and Janet McKelvy.**

70.     On March 9, 2010, Plaintiff obtained a judgment against Bill McKelvy in the Circuit Court of Walton County, State of Florida in the total amount of $1,648,278.38.

71.     On March 24, 2010, Plaintiff obtained a judgment against Janet McKelvy in the Circuit Court of Walton County, State of Florida in the total amount of $1,236,712.83.

72.     On April 25, 2011, Plaintiff obtained a judgment against Bill McKelvy in the Circuit Court of Santa Rosa County, State of Florida in the total amount of $944,297.50.[4]

---

[4]     The judgments identified in paragraphs 70 to 72 hereof shall collectively be referred to as the "Judgments," which continue to accrue interest as they remain outstanding and unsatisfied.

368429.19

73.     The Judgments remain unsatisfied in whole, and the total amount of $3,829,288.71 remains unpaid.  Enforcement of the Judgments has not been stayed, nor are the Judgments the subject of any pending appeal.

### III.     Bill and Janet McKelvy Use JTA as Their First "Piggy Bank" to Hide Their Assets.

74.     On or about May 15, 2008, Bill and Janet McKelvy directed Richard McBride, a lawyer practicing in Montgomery, Alabama, to form JTA as a family-owned, limited liability company.  Bill and Janet McKelvy instructed Richard McBride to create JTA in a manner that would make JTA's membership "anonymous."  This involved a four-step process by which:

      a.  Richard McBride filed the Articles of Organization for JTA listing himself as the member, manager and registered agent, but drafted in a way that avoided the need to amend the articles to admit other members;

      b.  Richard McBride then executed a Transfer and Assignment conveying all of his interest in JTA in equal 33.33% shares to Bill and Janet McKelvys' three grandchildren (Janet Sconiers, Thomas McKelvy and Addison McKelvy) under a custodial arrangement with their parents;

      c.  Richard McBride and the custodians executed a Unanimous Written Consent formally approving the transfers to Bill and Janet McKelvys' grandchildren and appointing Bill McKelvy as the manager of JTA, and they also executed an Admission Agreement acknowledging the grandchildren's admissions as members of JTA; and

      d.  Bill McKelvy and the custodial parents signed the operating agreement for JTA.

75.     As a result of this process, JTA's members were Dennis McKelvy, as custodian for James Thomas McKelvy ("Thomas McKelvy") and Addison McKelvy, and Rob Sconiers, as custodian for Janet Sconiers.  Bill McKelvy was the manager of JTA.

76.     Dennis McKelvy acknowledged that he acted as custodian for Thomas and Addison McKelvy in "several business groups" and that he signed the JTA formation documents.  When he testified about the ownership structure of JTA, Dennis McKelvy

21

mentioned that "it wasn't unusual for dad to not want to hold himself out as an owner in the past. So I don't think there would be anything unusual about keeping ownership of something anonymous."

77.   Following his formation of JTA, Bill McKelvy and Dennis McKelvy sought to disclaim or eliminate their "perceived" ownership or control over any entities that held assets that might be available for their creditors. By way of example, Bill McKelvy owned and controlled NO Development, a Florida corporation formed on June 6, 2005. On information and belief, Bill McKelvy used NO Development as his designated entity for development and construction work in the State of Florida.

78.   Despite continuing to operate, control, and manage NO Development until at least December 2011, Bill McKelvy abruptly resigned as a director of NO Development on or about May 14, 2009. While Bill McKelvy claimed to have sold NO Development in 2007, he continued to receive payments from NO Development until as recently as 2016, which he eventually transferred to GenFive.

79.   Additionally, on information and belief and at all relevant times with respect to this Complaint, Bill McKelvy and Dennis McKelvy continue to possess and use NO Development credit cards.

80.   Similarly, in November 2008, Bill McKelvy, Janet McKelvy, and Dennis McKelvy sought to eliminate any of their personal real estate holdings held in their own names.

81.   To accomplish this task, on or about November 18, 2008, Bill McKelvy, Janet McKelvy, JWM of Baker, Inc.,[5] and Dennis McKelvy conveyed fourteen (14) parcels of real

---

[5]   Previously, on or about April 17, 1998, Janet McKelvy had formed JWM of Baker, Inc., a Florida corporation.

property in Florida and Alabama to JTA. In a memorandum prepared by a law firm utilized by Bill and Dennis McKelvy, Clark, Partington, Hart, Larry, Bond & Stackhouse ("Clark Partington"),[6] the attorneys note that Bill and Dennis McKelvy "requested that [they] prepare warranty deeds transferring certain properties to JTA...." Moreover, Bill and Dennis McKelvy instructed them not to "[perform] title searches nor [issue] title policies in this transaction."

82.     Moreover, while Bill and Dennis McKelvy may have desired to structure this transaction as a sham "sale," their own lawyers noted that "the Promissory Note attached to your contract ... does not contain a date or an interest rate and may, therefore, be rendered unenforceable ... and is [also] unsecured...." At the time of the transfer and based on a schedule prepared by Bill McKelvy or his accountant, the estimated value of these properties was at least $700,000.

83.     On information and belief, Bill and Janet McKelvy directed the transfer of these properties in anticipation and preparation for the various loan defaults that would ensue against themselves and entities owned and controlled by them. On information and belief, Bill McKelvy, Janet McKelvy, and Dennis McKelvy transferred properties "out of their names" as a means to hinder, delay or defraud their creditors.

84.     On or about July 12, 2010, Bill and Janet McKelvy transferred ownership of a State Farm Universal Life Policy ensuring the life of Janet McKelvy (originally written in the name of Janet Waldrop, Janet McKelvy's maiden name) from Bill McKelvy to JTA (Policy No. LF-1084-5567). Said policy, in the original amount of $740,146, had a cash surrender

---

6       Clark Partington also provided legal services to Defendant Rupert Philips and his related entities.

value of $3,063.71 as of July 24, 2010, and originally named Bill McKelvy as the primary beneficiary.

85.    In 2008, Bill and Janet McKelvy also arranged for and opened a bank account in the name of JTA at CCB. Bill and Janet McKelvy transferred funds otherwise owned or held by them or their related and controlled entities to the JTA CCB bank account. Bill and Janet McKelvy also directed the transfer of cash and other liquid assets to the JTA bank account.

86.    Bill and Janet McKelvy received no consideration or value, let alone reasonably equivalent value, in exchange for their transfers of cash, real property, and insurance assets to JTA.

87.    None of JTA's members (themselves or through their custodians) ever received any financial statements, bank records, business documents, tax returns or other tax documents, or other information about JTA's assets, liabilities or operations.

88.    JTA never made any distributions to any of its named members (or to their custodians). In fact, Bill McKelvy and Dennis McKelvy kept the minor children in the dark about JTA's operations.

89.    Despite holding substantial assets (for which it paid no consideration), JTA never conducted any business – other than the subsequent transfer and liquidation of assets unlawfully transferred to it from Bill, Janet, and Dennis McKelvy. On information and belief, Bill and Janet McKelvy operated JTA as a dummy, sham corporation, and used JTA bank accounts as personal "slush" funds to conduct their other businesses and to hide their liquid and non-liquid assets.

24

**IV.** **Bill and Janet McKelvy Form GenFive as Their New Personal "Piggy Bank."**

90.     On information and belief, in late 2010, as a result of collection activities of one or more of Bill and Janet McKelvys' creditors, including Plaintiff, Bill and Janet McKelvy determined that they needed to move their assets out of JTA and their other entities and into a new, "creditor-protected" entity under their control.

91.     On December 27, 2010, nine months after the court entered Plaintiff's first judgment, Bill and Janet McKelvy formed GenFive (through their attorney Richard McBride).

92.     In forming the entity, Richard McBride utilized the same anonymous structure by which he formed JTA, described above, at the direct request of Bill and Janet McKelvy (conveyed through correspondence from Dennis McKelvy). Bill McKelvy eventually acted as GenFive's manager, and GenFive's members were Dennis McKelvy as custodian for his children Addison McKelvy and Thomas McKelvy and Sarah Tinklepaugh as custodian for her child Janet Sconiers.

93.     Dennis McKelvy acknowledged that he acted as custodian for Thomas and Addison McKelvy and signed the GenFive formation documents; and at various times (and when convenient to Defendants' unlawful scheme), Dennis McKelvy may have acted as manager of GenFive, though he acknowledged that he keeps no independent custodial records for the minor purported owners.

### A.     *GenFive Is Bill and Janet McKelvys' New Alter Ego.*

94.     Even though they possessed no legal ownership or interest in it, GenFive was nevertheless the primary alter ego of Bill and Janet McKelvy after GenFive's formation, and at all relevant times.

95.     Despite allegedly being formed to preserve assets for Bill and Janet McKelvys' grandchildren, the property and money obtained by GenFive were not used for the benefit of any minor children.

96.     As Crystal McKelvy testified, none of her children—the alleged "beneficiaries" of GenFive—ever received any funds from the GenFive Account or other assets or benefits from GenFive.  Dennis McKelvy also testified that he kept no records or files and received no reports as to the business operations of GenFive.  Just as with JTA, no reporting was made to any of the custodians.

97.     Moreover, none of the alleged beneficiaries of GenFive ever received tax documentation from GenFive or filed tax returns demonstrating their distributive share of income they "received" as member of GenFive.  Instead, Bill and Janet McKelvy have completely controlled, dominated, managed and operated GenFive and the GenFive Account for their own personal benefit, without respecting or reporting the tax consequences of asset transfers to and from GenFive.

98.     Bill and Janet McKelvys' control of GenFive's finances and operations is illustrated by, *inter alia*, the transfer of funds from GenFive's accounts to various entities and for their personal benefit, through cash withdrawals and the funding of unlawful investments. Bill, Janet and Dennis McKelvy, and certain other Defendants used the GenFive Account to: (a) pay personal bills and fund Bill and Janet McKelvys' lifestyles; and (b) access cash to fund unlawful investments (as described in detail below).

99.     For these reasons, GenFive is, and at all times herein mentioned was, a mere shell and instrumentality through which Bill and Janet McKelvy exercised complete control

26

and dominance of its activities and assets for their personal benefit without any regard to the separateness of the entity.

100. Bill and Janet McKelvy utilized GenFive in furtherance of their scheme to defraud creditors. As set forth below, Bill and Janet McKelvy directed GenFive to transfer substantial assets to other entities and directed other entities to transfer funds to GenFive.

101. To hide their unlawful activities, Bill and Janet McKelvy kept inaccurate records, or no records, of GenFive's activities. As Dennis McKelvy testified, Bill McKelvy kept limited written notes on GenFive, in the "the margin of the [GenFive] checkbook... despite orchestrating millions of dollars of transfers... [a]nd I think there's little yellow notepads. He loves little yellow notepads."

102. In furtherance of the scheme to hide GenFive's activities, Bill McKelvy often conveniently "lost" or "left" the GenFive checkbook with family members to conceal it from his creditors. Dennis McKelvy acknowledged that Bill McKelvy "has left things at the house on accident, on purpose—I don't know which.... Talk about something in the car, go to lunch, climb out, he heads off, and I look in the back seat and there it is."

103. To date, Bill and Janet McKelvy continue to exercise complete control over GenFive.

104. Adherence to the fiction that GenFive is an entity separate and distinct from Bill and Janet McKelvy would permit an abuse of the corporate privilege, and would promote injustice because Bill and Janet McKelvy have illegitimately used GenFive as a means of financing and supporting their *personal* investments, and to transfer funds so that they are outside the reach of their creditors, including Plaintiff.

368429.19

**B.      Bill and Janet McKelvy Utilize Their Relationship with Johnny Kincey and BancorpSouth to Establish the GenFive Account and Hide Their Money Laundering Scheme.**

105.    Johnny Kincey is a longtime business associate and friend of Bill and Janet McKelvy. Johnny Kincey first met Bill McKelvy when he was employed at Colonial Bank in 1993. While at Colonial Bank, on information and belief, Johnny Kincey was one of, if not the primary, business relationship contact and lender for Bill McKelvy and his businesses.

106.    In 2006, Johnny Kincey left Colonial Bank to work with Bill McKelvy as a co-owner and employee of Whitetail Land & Management Corp., an Alabama corporation ("Whitetail"). On November 28, 2006 Whitetail was formed to be a developer of real property for gaming and hunting purposes. Upon information and belief the venture was used to build a hunting lodge for Bill and Janet McKelvy, and a second lodge for former Alabama Congressman, and convicted felon, Michael Hubbard.[7] Those were the sole "developments" of Whitetail.

107.    In September 2009, Johnny Kincey returned to banking, joining BancorpSouth. Eventually, Johnny Kincey obtained the position of First Vice President with BancorpSouth. One of the first accounts he opened was for Square Donut, yet another entity created by Bill and Janet McKelvy with the so-called "JTA model".

108.    In 2010, after the formation of GenFive, Johnny Kincey assisted Bill, Janet and Dennis McKelvy in establishing a bank account at BancorpSouth, personally attending a meeting with the customer service representative responsible for "opening" the account. This

---

[7]     *See, e.g.*, AL.com "Alabama House Speaker Mike Hubbard is guilty, but that's not all," (June 10, 2016), available at http://www.al.com/opinion/index.ssf/2016/06/mike_hubbard_is_guilty_but_tha.html

368429.19

business relationship was an instrumental part of Defendants' scheme to fraudulently transfer funds, make unlawful foreign investments, obtain counterfeit currency, and evade tax liabilities.

109.    On or about January 5, 2011, Bill McKelvy and Dennis McKelvy opened an account for GenFive at a BancorpSouth branch in Auburn, Alabama (the "GenFive Account") with the assistance, and at the direction, of Johnny Kincey, who was acting as a bank Vice President at that time.  On information and belief, Dennis McKelvy acted as the manager of GenFive and controlled the creation of the bank account and subsequent account changes.

### C.    Bill and Janet McKelvy Keep the GenFive Account Out of Their Name.

110.    While he was initially an authorized signatory on the GenFive Account, Bill McKelvy refused to sign checks from the account after Plaintiff took his initial examination and asked questions about GenFive.  Instead, he made his family members sign blank GenFive Account checks as a means to confuse and defraud his creditors while allowing him to reach the funds held therein.

111.    On or about January 28, 2011, Bill McKelvy, Dennis McKelvy, and Janet McKelvy executed signature cards for the GenFive Account, and became authorized signatories.  Dennis McKelvy has acknowledged that he executed the January 2011 signature cards for the GenFive Account.

112.    From January 2011 through October 2011, all three of these individuals signed checks on the GenFive Account.

113.    On October 11, 2011, Plaintiff took an initial examination of Bill McKelvy in seeking to enforce its Judgments.  During that examination, Bill McKelvy claimed that he did

not know who formed GenFive, and that he thought Dennis McKelvy may have formed it. He also indicated that his three grandchildren were the members of GenFive, though being minors.

114. On the same exact day, Sarah Tinklepaugh and Dennis McKelvy executed a new signature card for the GenFive Account. On information and belief, Bill and Janet McKelvy directed Dennis McKelvy and Sarah Tinklepaugh to take such actions as a result of Plaintiff's deposition of Bill McKelvy. This new signature card eliminated Bill McKelvy's authorization to sign checks on the GenFive Account. Plaintiff only discovered this change after additional post-judgment discovery in 2016.

115. From October 2011 to July 2013, Sarah Tinklepaugh (Bill and Janet McKelvy's pseudo-adopted daughter) executed numerous blank checks on the GenFive Account at the direction of Bill McKelvy. As she testified, "they had them in a book, and all I did was sign, sign, sign, flip, sign, sign, sign."

116. On or about June 26, 2013, Dennis McKelvy and Janet McKelvy again executed a new signature card for the GenFive Account. On information and belief, Defendants removed Sarah Tinklepaugh's signing authority because of her estrangement from the McKelvy family. From June 2013 to June 2014, Dennis and Janet McKelvy signed and executed numerous GenFive checks, on information and belief, in furtherance of the overall scheme to hide and transfer assets.

117. Defendants changed the signatories to the GenFive Account on an additional occasion. On or about July 11, 2014, Dennis and Crystal McKelvy signed a fourth signature card for the GenFive Account. As a result, and—on information and belief—as of the date

hereof, Dennis and Crystal are the only two individuals that can sign checks for the GenFive Account. Defendants removed Janet McKelvy from the GenFive Account in an effort to hinder, delay or defraud her creditors and Bill McKelvy's creditors.

118.    Even though they ceased having signing authority on the GenFive Account, Bill and Janet McKelvy nonetheless continued to write (but not sign), issue, cash, and endorse checks to and from the GenFive Account, enabled by the efforts of Dennis McKelvy and Crystal McKelvy. In particular, Bill and Janet McKelvy traveled to BancorpSouth to cash checks for Bill McKelvy and other Defendants (*see infra*, Section VI).

119.    In 2014, Dennis McKelvy, as the primary signatory to the GenFive Account, signed numerous blank checks that Bill McKelvy would later fill-out and tender, issue, cash and/or deposit.

120.    As described in more detail below, Dennis McKelvy and Johnny Kincey were instrumental in Bill and Janet McKelvys' fraudulent scheme related to transfers into and out of the GenFive Account. Dennis McKelvy assisted Bill McKelvy in negotiating hundreds of checks. On information and belief, Johnny Kincey provided internal "cover" to Bill and Janet McKelvys' structuring and cash laundering scheme at BancorpSouth (*see infra*, Section X).

## V.    Bill and Janet McKelvy Direct the Transfer of Substantial Assets and Funds to GenFive From Their Prior Entities and From Their Business Partners.

121.    As described above, Bill and Janet McKelvy intended to use GenFive and the GenFive Account as their new "slush fund" to sponsor and finance their unlawful scheme.

122.    In switching to GenFive and the GenFive Account (and in lieu of making direct transfers to themselves), Bill and Janet McKelvy began a pattern of conduct by which they directed all of their business associates to transfer funds directly to GenFive and the GenFive

Account, hereinto referred to as the "GenFive Deposit Transfers," as discussed in Section V. A schedule of the checks deposited and wire transfers made directly to the GenFive Account is attached hereto as **Exhibit 1** and incorporated herein by reference.

### A. JTA, NO Development, and Other Bill McKelvy Business Associates Make Direct Transfers to the GenFive Account.

123.    By checks dated January 4, 2011 and January 18, 2011, Bill and Janet McKelvy directed JTA to transfer $10,000 to GenFive. On information and belief, these checks represented the last funds held by JTA that Bill and Janet McKelvy had preserved from the reach of their creditors.

124.    Additionally, Bill and Janet McKelvy directed numerous other entities to "pay" GenFive amounts otherwise owed to them. By way of example, in 2011, Bill and Janet McKelvy directed the following third-parties to make the following transfers to the GenFive Account:

a.  NO Development transferred almost $18,268, even though it performed no services for GenFive and was not owned by GenFive[8];

b.  Helen Salter, who operated a barbershop on land owned by, on information and belief, Helen's Barber & Style Shop, located at 537 South Ferdon Blvd., Crestview, Florida 32536, transferred payments totaling to $34,150, with all such checks made payable to Bill McKelvy. On information and belief, Bill McKelvy (or a related entity) owned this property previously, and sold it to Ms. Salter through an installment contract. On information and belief, GenFive never owned this property;

c.  Willis Wayne Bush PC, a law firm used by Bill McKelvy, transferred $34,420 despite, on information and belief, never providing legal services to GenFive;

d.  Wilda Vae and Eugene Mayhew, who owned a restaurant located in Florida, transferred $14,575 through checks written to JTA; and

---

[8]    As of December 31, 2007, Bill McKelvy owned 100% of NO Development.

368429.19

e. Kathy B. Cooper transferred $1,266, through checks written to JTA. Ms. Cooper went on to transfer even more funds in 2012, totaling $3,545.

125.   Bill and Janet McKelvy directed these transfers to GenFive even though GenFive provided no value or consideration in exchange for the transfers at issue. In many instances, JTA, Bill McKelvy, or Janet McKelvy provided consideration for the transfers.

126.   While many entities owned or controlled by Bill and Janet McKelvy transferred funds to the GenFive Account, only some of them actually wrote checks to GenFive. Instead, Bill and Janet McKelvy directed the transfer of checks written to themselves and to their entities into the GenFive Account on numerous occasions.

127.   Few, if any, of these checks were actually signed over by Bill McKelvy or Janet McKelvy to GenFive. Instead, on information and belief, Bill and Janet McKelvy used their connections with Johnny Kincey and BancorpSouth to ensure that BancorpSouth honored checks made out to third-parties and deposited such checks into the GenFive Account, many without being properly endorsed.

128.   The amount of checks made out to third parties, but deposited into the GenFive Account, was substantial. From 2011 through 2015, Bill and Janet McKelvy directed the deposit of checks made out to third-parties totaling to $626,962, including:

a. $166,209 in checks made payable to JTA;

b. $196,204 in checks made payable to NO Development (including checks from other Bill McKelvy businesses like Vics of Navarre);

c. $210,375 in checks made payable to Bill McKelvy, Janet McKelvy, or other members of the McKelvy family; and

d. $7,221 to Janet Sconiers (daughter of Sarah Tinklepaugh and Rob Sconiers).

368429.19

129.    As just one example of the foregoing, in August and October 2011, Bill and Janet McKelvy directed checks made payable to Bill McKelvy from the United States Treasury to the GenFive Account, with the aggregate amount of such checks totaling to $3,948. On information and belief, none of these monies paid by the United States Treasury had any link to or connection with any activities or business of GenFive.

130.    In addition to money transferred to the GenFive Account that were payable to a different third-party, Bill and Janet McKelvy directed numerous other third-parties to make transfers to GenFive even though such amounts should have been paid directly to them including the following parties:

   a. Alan Cotton and Alan Cotton's Florist transferred $68,618.12 to GenFive for purported construction work managed by Bill McKelvy (and not GenFive), though Bill McKelvy has no records supporting this work;

   b. The trustee for the estate of Louise McKelvy—the deceased mother of Bill McKelvy—paid inheritance owed to Bill McKelvy to the GenFive Account in the amount of $161,274.47;

   c. Murphy, Murphy & McGalman, PC—a law firm that provided services to Bill McKelvy—transferred $137,754.48 to the GenFive Account;

   d. JMW of Andalusia transferred $235,000 to GenFive for purported construction work managed by Bill McKelvy (and not GenFive);

   e. Blackwater Settlement transferred $792,526 to GenFive, for the purported filing and recovery of BP economic damage claims on behalf of businesses located in Florida and Alabama (*see* Sections B, C, *infra*); and

   f. Rupert Phillips through HCB Financial, Green River, Phillips Capital, and Paradise Liquors of the Emerald Coast, transferred $200,000 to GenFive (as described below).

131.    On information and belief, none of these parties had any legitimate business relationship with GenFive or any of GenFive's purported "minor" owners.

34

> **B.**   *Mike Ward and Craig Shaw Assist Bill McKelvy with the Unlawful Scheme to Pay GenFive and Hide Bill McKelvy's Ownership in Blackwater.*

132.   The vast majority of funds received by Bill McKelvy and deposited into the GenFive Account originated from Bill McKelvy's interests in Blackwater.

133.   Blackwater is an enterprise involving Bill McKelvy, Craig Shaw, and Mike Ward. As described in more detail below, Bill McKelvy and Mike Ward have known each other since high school. Bill McKelvy and Craig Shaw have known each other for many years. Their initial joint venture involved the failed acquisition of First National Bank of Crestview.

134.   Bill McKelvy originally formed Blackwater (named Blackwater Oil and Gas, LLC) for the alleged purpose of purchasing and operating an oil well in Colorado. As Craig Shaw described it: "we set up Blackwater Oil & Gas, I think, with four members. And our intent was to invest in an oil well in Colorado. Because that is where Mr. Ward was working at the time managing some businesses out there that were in the oil business. But it never developed, so it went away."

135.   After the Deepwater Horizon/BP Oil Spill of 2010, Blackwater's purpose changed to an entity that assists with the filing and recovery of BP economic damage claims on behalf of businesses located in Florida and Alabama.

136.   Bill McKelvy and his longtime friend Craig Shaw came up with the idea for Blackwater and its claim-handling business; neither GenFive nor its members played any part in the formation, business planning, or operation of Blackwater. Irrespective of these facts, the initial members of Blackwater were Bill McKelvy, Craig Shaw, and GenFive, with each owning one-third (33.33%) of Blackwater's membership interests.

368429.19

137.    On or about March 30, 2012, Bill McKelvy transferred his individual membership interest (33.33%) in Blackwater to Mike Ward via an Agreement for Transfer of Blackwater Oil & Gas, LLC.  This transfer document specifically states that Mike Ward received the transfer "without any consideration paid to [Bill McKelvy]."  On information and belief, Bill McKelvy agreed to transfer this interest to Mike Ward "without any consideration" because of Mike Ward's continued involvement in Defendants' unlawful scheme.

138.    Blackwater, at Bill McKelvy's direction, has paid at least $790,801 to GenFive from December 11, 2012 through November 23, 2015. Bill McKelvy has personally signed at least twenty-seven (27) checks on behalf of Blackwater, payable to GenFive for a total of $444,074, with the remainder of the checks from Blackwater to GenFive being signed by Bill McKelvy's two friends and co-conspirators, Craig Shaw and Mike Ward.  A schedule of the checks sent from Blackwater directly to GenFive is attached hereto as **Exhibit 2** and incorporated herein by reference.

139.    Initially, Bill McKelvy "maintained" the checkbook for Blackwater.  Thereafter, Mike Ward maintained the checkbook, and upon information and belief, Craig Shaw is the current custodian for the Blackwater checkbook.

140.    Despite having multiple individuals in "control" of the checkbook, all checks issued by Blackwater were approved by at least two of the three "partners."  As Mike Ward testified: "[o]f the checks that are written, any time anybody in the company has written checks, to my knowledge there's been a conversation with at least one of the other partners before it's issued."

141.    In the course of his relationship as an owner of Blackwater, Mike Ward executed several checks, including those provided to GenFive as "distributions" or for the alleged repayment of loans.

142.    On information and belief, Mike Ward knew that Bill McKelvy—and not GenFive—should have been the owner of Blackwater based on his role in establishing the business and operations. On information and belief, Mike Ward knew that Bill McKelvy—and not GenFive—provided the assets and funds initially to support and finance Blackwater. On information and belief, Mike Ward assisted Bill McKelvy in directing funds to GenFive—and not Bill McKelvy—as a means of hindering, delaying, and defrauding Bill and Janet McKelvys' creditors.

143.    In the course of his relationship as an owner of Blackwater, Craig Shaw also executed several checks, including those provided to GenFive as "distributions" or for the alleged repayment of loans.

144.    While he was signatory on the Blackwater account, Craig Shaw signed seven checks, in the amount of $98,374, on behalf of Blackwater payable to GenFive at Bill McKelvy's direction.

145.    Craig Shaw signed these checks even though he testified on December 15, 2015, that Mike Ward—and not Bill McKelvy—managed Blackwater's business:

> Q: Now, does Mr. McKelvy handle any client relations for
>     Blackwater?
> A: I don't know. Mr. Ward does.
> Q: Does Mr. McKelvy manage Blackwater at all?
> A: No. Mr. Ward does.

368429.19

146.    On the same date, Craig Shaw also testified that he had no idea as to the purpose for any of the checks that Blackwater has paid to GenFive-even the checks that Craig Shaw signed on behalf of Blackwater to GenFive:

> Q: So do you sign checks on behalf of Blackwater?
> A: I have signed checks, yeah.
> Q: Who requests you to sign these checks?
> A: I don't prepare the checks, I just sign them.
> Q: Do you just sign them without asking questions?
> A: Yes.
> Q: Who would have presented this check to you to be signed?
> A: Mike would bring them by or Mike and I would be together
>     when I would sign them.

147.    In addition to facilitating payments to Bill McKelvy, Craig Shaw also lent money to Bill McKelvy, on information and belief, in furtherance of his unlawful scheme. On or about December 12, 2014, Craig Shaw transferred $35,000 to GenFive by check. While Craig Shaw claimed the transferred funds represented a (still unpaid) loan, he never received—and Bill McKelvy never signed—any documents evidencing said loan. On information and belief, Bill McKelvy ultimately used these funds for purposes of this unlawful scheme.

148.    On information and belief, Craig Shaw knew that Bill McKelvy—and not GenFive—should have been the owner of Blackwater based on his role in establishing the business and operations. On information and belief, Craig Shaw knew that Bill McKelvy— and not GenFive—provided the assets and funds initially to support and finance Blackwater. On information and belief, Craig Shaw assisted Bill McKelvy in directing funds to GenFive— and not Bill McKelvy—as a means of hindering, delaying, and defrauding Bill McKelvy's creditors.

368429.19

149.    On information and belief, Blackwater served as yet another entity through which Bill and Janet McKelvy transferred funds they were personally entitled to, into GenFive, in an effort to place assets beyond the reach of their creditors and enrich themselves and their family members.

150.    On information and belief, Bill McKelvy also used transfers from Blackwater as a means of "rewarding" or compensating other Defendants involved in their scheme.  By way of example, in 2014, Blackwater reported distributable income to Crystal McKelvy in the amount of $6,454, even though she testified that she had no involvement with Blackwater or knowledge of its business.

C.    **Rupert Phillips Directs the Transfer Of $200,000 to GenFive Instead of Bill McKelvy to be Invested into a Philippines Gold Mine.**

151.    Upon information and belief, Rupert Phillips is a long-time, successful investor located in Destin, Florida.  Rupert Phillips conducts his operations through several entities including, *inter alia*, HCB Financial, Green Energy, and Phillips Capital, which, on information and belief, acts as a holding company and internal "bank" for Rupert Phillips' other business entities.

152.    Rupert Phillips and Bill McKelvy have been in business together for twenty-five to thirty years.  At one point, Bill McKelvy was a part of owner of HCB Financial and was a business partner with Rupert Phillips in other investments throughout the State of Florida. Prior to the recession in 2008, Bill McKelvy and Rupert Phillips collectively attempted to acquire a commercial bank in Florida through HCB Financial.

368429.19

153.    After the failure of HCB Financial to acquire a commercial bank, Rupert Phillips utilized HCB Financial and certain other related entities to acquire distressed debt, including, in many circumstances, debt owed by his related entities to unrelated banks and financial institutions.  On information and belief, Rupert Phillips—through his related entities—often acquired debt owed by his own companies as a means to "block" or "limit" the ability of other, third-party creditors to recover on their valid claims against him (through personal guarantees) and his investment or operating entities.[9]

154.    On or about April 30, 2014, Rupert Phillips directed HCB Financial to transfer $35,000 to Bill McKelvy via a check written to GenFive.

155.    As Rupert Phillips testified, Bill McKelvy "instructed" Rupert Phillips to make "some payment" to GenFive.  While Rupert Phillips claimed that he transferred such money to Bill McKelvy as a loan, he also claimed such transfer was made as a "gift" to Bill McKelvy.  Indeed, Rupert Phillips admitted that no loan or other documents existed between Rupert Phillips and Bill McKelvy memorializing the "loan" by HCB Financial to Bill McKelvy.  When asked about the transfer from HCB Financial, however, Bill McKelvy testified that he "literally [did] not know" the reason for the transfer and "had no idea that [he] had gotten that kind of money from Rupert" Phillips.

156.    On or about March 18, 2015, Rupert Phillips directed Green Energy to transfer $40,000 to Bill McKelvy via check written to GenFive.  Much like the transfer from HCB Financial to Bill McKelvy via GenFive, Rupert Phillips claims this transfer was a "loan" or

---

9        Such schemes are described in detail in a recent decision from the District Court for the Northern District of Florida: *SE Property Holdings, LLC v. HCB Financial Corp.*, Case No. 13-cv-6 (N.D. Fla. September 24, 2015).

368429.19

perhaps a "gift." Rupert Philips also claimed that Bill McKelvy instructed him to transfer the money to GenFive.

157. In addition to transfers directly from his business operations, Rupert Phillips also directed third-parties to make transfers to Bill McKelvy. Beginning in October 2014 and ending in March 2015, Rupert Phillips directed Paradise Liquors, a company that owed a debt to Rupert Phillips, to make three transfers to Bill McKelvy via GenFive, with such transfers totaling to $33,000.

158. While he directed these transfers be made to GenFive, Rupert Philips actually arranged for the delivery of the Paradise Liquors checks to Bill McKelvy. Utilizing his own address and FedEx account, Rupert Phillips sent the three checks via overnight FedEx delivery in October 21 2014, February 23, 2014 and March 24, 2015.

159. These checks were sent not to Bill McKelvy or to his personal residence in Andalusia, Alabama. Instead, they were each sent to Bill McKelvy at Cotton's Florist (226 South Cotton Street, Andalusia, AL 36420). On information and belief, with the agreement of Alan and Sue Cotton, Bill McKelvy directed the transmission of the Paradise Liquors checks to Cotton's Florist to avoid having record of their transmittal to his residence and to actually hinder, delay, and defraud his creditors, including Plaintiff.

160. Again, Bill McKelvy testified to complete ignorance with respect to the existence of these transfers and why they were made to GenFive.

161. On or about May 20, 2015, Rupert Phillips directed his counsel, Clark Partington, to transfer $42,000 to GenFive. In anticipation of making the May 20, 2015 transfer, Johnny Kincey, on behalf of Bill McKelvy, emailed Rupert Philips a week prior,

41

368429.19

stating that "Bill asked me to send you the wiring info for you to wire funds to the Generation Five Financial Group, LLC account." In said email, Johnny Kincey—which he sent utilizing his BancorpSouth email address (John.kincey@bxs.com)—included wire transfer instructions. Rupert Philips received such email at his HCB Financial email address (rupert@hcbfinancialcorp.com).

162.    Again, like the transfers from HCB Financial and Green Energy to Bill McKelvy via GenFive, Rupert Phillips claims this transfer was a "loan" or perhaps a "gift." Rupert Philips also claimed that Bill McKelvy instructed him to transfer the money to GenFive.

163.    Despite testifying that such money was a loan or gift to Bill McKelvy, Joe Dobson, the President of HCB Financial, stated in an email at the time, that such transfer was made on "a commission paid by HCB Financial Corp out of the CPH escrow account to Generation Five Financial Group, LLC on a loan we are issuing on a Walton County liquor license."

164.    Similarly, Rupert Phillips, when instructing Scott Campbell, an attorney at Clark Partington, stated that the transfer needed to be made, and suggested that time was of the essence: "Wire $42,000 out of the $300,000 in escrow for the liquor license loan TODAY. I know this is before closing but needs to be done today." Rupert Phillips also included wire transfer instructions for the GenFive Account in his email to Scott Campbell. Scott Campbell sent Rupert Philips (the Chairman of HCB) and Joe Dobson (the President of HCB) email confirmation of the May 20, 2015 wire transfer from through their bank, Regions Bank.

165.     On information and belief, in making the May 20, 2015 transfer, HCB Financial paid Bill McKelvy for services rendered to it (as a commission), even though the money was owed to Bill McKelvy, HCB Financial nonetheless directed the payment of GenFive.

166.     On or about January 5, 2016, Rupert Phillips again directed Clark Partington to transfer an additional $50,000 to GenFive.   At that time, Scott Campbell sent Rupert Philips (again to his HCB account) an email confirmation of the January 5, 2016 wire transfer from through their bank, Regions Bank.

167.     Unlike the transfers from HCB Financial and Green Energy to Bill McKelvy via GenFive (and the previous transfer from Clark Partington), Rupert Phillips claims he directed this transfer in consideration for consulting work performed by Bill McKelvy.  Like the other transfers, however, Rupert Phillips made the transfer of $50,000 to GenFive at the request of Bill McKelvy, even though GenFive provided no services to Rupert Phillips or his related entities.

168.     In total, Rupert Phillips directed $200,000 in transfers to Bill McKelvy with actual knowledge that Bill McKelvy was using the funds for business ventures with Chaim Hershkowits in the Philippines.  Rupert Phillips also admitted that he had provided funds directly to Chaim Hershkowits while he was located in the Philippines, which Rupert Phillips claimed were used by Chaim Hershkowits to acquire a prosthetic leg for himself.

169.     On information and belief, despite Bill and Janet McKelvys' alleged cessation of all business activities, Bill, Janet McKelvy and Rupert Phillips continue to do business together with respect to, among other things, Bill and Janet McKelvys' unlawful foreign investments in the Philippines, including a gold mine (*infra*, Section VIII).

43

368429.19

170.   On information and belief, Rupert Phillips directed these transfers to Bill McKelvy in payment of, or as consideration for, the continued business ventures between Bill McKelvy and Rupert Phillips which included, *inter alia*, the unlawful foreign investments and obtainment of counterfeit money at the heart of Bill and Janet McKelvys' unlawful scheme.

### D.   Despite His Clear Involvement With GenFive, Bill McKelvy Claims To Have No Knowledge of The Entity Or Its Businesses.

171.   After it initially obtained its Judgments against Bill McKelvy and Janet McKelvy, Plaintiff examined Bill McKelvy on October 11, 2011.  In the course of such examination, Plaintiff asked direct questions about GenFive and its relationship to Bill McKelvy.

172.   During such examination, Bill McKelvy lied to and misled Plaintiff about his role and his involvement with the entity:

> Q: And who is Generation Five Financial Group?
> A: My grandchildren.
> * * *
> Q: Okay.  Is it an LLP, LLC, do you know?
> A: I don't know.
> Q: Okay, who formed this?
> A: I don't know.
> Q: Did you have an accountant form it?
> A: No.  A lawyer formed it, I just don't know who.
> Q: Is there an agreement between this group?
> A: What do you mean?
> Q: Is there a partnership agreement, operating agreement, bylaws?
> A: I have no idea.
> Q: Okay.  Who formed this group, did you?
> A: No.
> Q: Who formed it?
> A: I think Dennis.

173.   Later, Plaintiff asked Bill McKelvy about the source of funds for GenFive to have acquired a piece of property located on Church Street, Andalusia, Alabama (which

44

GenFive subsequently sold). In response, Bill McKelvy again pled ignorance about GenFive and its assets, claiming that Dennis McKelvy controlled the entity:

> Q: And you say they pay the bill, who is "they"?
> A: Generation Five.
> Q: What are the sources of their funds?
> A: Don't ask me.
> Q: So you don't know where this money is coming from that's paying for your house?
> A: Out of their general fund .... I don't know.
> * * *
> Q: Okay. How does the entity have money?
> A: I don't know.
> Q: Who would know that?
> A: Nobody. ... Dennis might know. I don't know.
> * * *
> Q: Whose money is being used to pay for your retirement home?
> A: Generation Five's.
> Q: How does Generation Five have money?
> A: I don't know.
> * * *
> Q: Is any of your own personal money put into Generation Five?
> A: No.
> Q: Any of your investments or portfolios or gifts given to Dennis McKelvy put into Generation Five?
> A: Of course not.

174. During this same examination, Bill McKelvy also lied to and misled Plaintiff with respect to his relationship and ownership interest in JTA. Bill McKelvy also claimed to have no interest in Vic's of Navarre, LLC during this examination—even though the entity subsequently transferred thousands of dollars to him through NO Development and GenFive. Finally, Bill McKelvy claimed to have no interest in Beach Metals, even though, on information and belief, Defendants continue to use such entity as part of their gold mining and foreign investment scheme.

175.   At the time of this examination, Bill McKelvy had already directed the formation of GenFive and directed the transfer of over $71,402.20 in cash and assets to GenFive. Bill McKelvy had endorsed at least four (4) checks written to cash and withdrawn from the GenFive Account and has signed twenty-seven (27) checks written from the GenFive Account. On information and belief, Bill McKelvy purposefully evaded Plaintiff's questions and lied about his assets and his knowledge of GenFive during this examination to avoid Plaintiff from discovering these assets and Defendant's unlawful scheme.

176.   Following its conduct of these post-judgment collection activities beginning in October 2015 and throughout 2016, Bill McKelvy failed to disclose these transactions to Plaintiff, and actively lied and misled Plaintiff about his involvement with GenFive during his creditor examination on October 11, 2011. Moreover, several of these transactions occurred after said examination in October 2011.

## VI.   Bill and Janet McKelvy Make Multiple Withdrawals of Cash From the GenFive Account on a Monthly Basis to Avoid the Federal Reporting Requirements.

177.   As described in detail above, Bill and Janet McKelvy directed the transfer of millions of dollars in cash to the GenFive Account, with such transfers totaling in excess of $2.4 million from January 2011 to August 2016.

178.   In utilizing this cash transferred to GenFive, Bill and Janet McKelvy orchestrated a systematic series of transfers from the GenFive Account, with over $2,445,801 paid or withdrawn by check.

179.   Of the over $2.4 million transferred from the account, over $1,234,100 was withdrawn as cash from the GenFive Account. Specifically, Bill and Janet McKelvy cashed

checks made to "cash" as set forth on **Exhibit 3** hereto (which is incorporated herein by reference) (collectively, the "GenFive Cash Withdrawals"). Bill McKelvy has testified that these cash disbursements from the GenFive Account constitute undocumented loans from GenFive.

180.    As often as multiple times per week, Bill and Janet McKelvy (but typically Janet McKelvy) drove to Greenville, Alabama or Auburn, Alabama. In Greenville, Alabama, BancorpSouth had a bank branch located at 1028 Fort Dale Road, Greenville, Alabama 36037. In Auburn, Alabama, BancorpSouth had a bank branch located at 807 E Glenn Avenue, Auburn, Alabama, 36830.[10]

181.    Bill and Janet McKelvy utilized either the Greenville, Alabama or Auburn, Alabama branch to make cash withdrawals and deposit checks using the GenFive Account. Bill and Janet McKelvys' behavior in withdrawing and depositing checks was extraordinary in that:

     a.  On information and belief, all of the checks appear to have been negotiated during a span of over 150 separate trips to these BancorpSouth branches, requiring significant effort by Bill and Janet McKelvy.

     b.  Bill and Janet McKelvy made these trips despite the fact that many of the checks were not written to GenFive but were instead written to third parties owned by, or affiliated with Bill McKelvy.

     c.  Bill and Janet McKelvy made these trips despite the fact that the Greenville branch of BancorpSouth was located over fifty miles (50 miles) away and the Auburn branch was located over one hundred thirty (145) miles from their "gifted" home in Andalusia, Alabama.

---

[10]   Given the fact that there are numerous banks located in Andalusia, Alabama, Bill and Janet McKelvys' decision to use BancorpSouth is illogical and imprudent, when its closest branch is fifty (50) miles from Andalusia. However, given the unlawful transactions they managed for years at the Greenville branch, a reasonable suspicion of BancorpSouth's complicity arises.

182.   As described above, Dennis McKelvy signed many of these checks for cash on behalf of GenFive. Additionally, Bill and Janet McKelvy directed Sarah Tinklepaugh to sign checks from the GenFive Account, prior to her estrangement from the McKelvy family in 2013. Despite directing all of these transfers, Bill McKelvy has not signed a single GenFive check since September 16, 2011.

183.   Bill and Janet McKelvy would negotiate and cash these checks at the Auburn, Alabama or Greenville, Alabama BancorpSouth branches. Janet McKelvy would negotiate these checks at BancorpSouth even though she held personal accounts at CCB Community Bank, conveniently located in Andalusia, Alabama at 225 East 3 Notch Street, Andalusia, Alabama 36420, less than a mile from the "gifted" McKelvy residence.

184.   As admitted by Bill McKelvy during testimony in April, 2016 (and corroborated by testimony from Dennis McKelvy, Rupert Philips, and Johnny Kincey), Defendants structured these cash withdrawals from the GenFive Accounts in amounts less than $10,000 to avoid, *inter alia*, the reporting requirements under 31 C.F.R. §§ 103.22(a) and 1010.311 and 31 U.S.C. § 5313(a). As Bill McKelvy testified to Plaintiff on April 25, 2016:

> A. Just whatever is convenient. Whatever is in the account?
> Whatever is—you know, but you have to stay under $10,000
> to cash checks in the United States.
> Q. What's your understanding of that rule?
> A. I know exactly what that rule is.
> Q. Tell me.
> A. You—you are allowed—as long as it's in a normal course of
> business, you are allowed to cash a check under $10,000 at
> any time, any place, as long as it's for a legal purpose.
> And—and the only time that is not true is if it's in—and I
> don't mean legality. I mean, it's not a normal course of
> business for you to cash checks. I've always cashed checks.
> I can—I can go back to my—I don't know—my fifteenth
> birthday and I've been cashing checks.

\* \* \*

Q. And so back to the $10,000 rule. You used to sit on a bank
board, didn't you?

A. Of course.

Q. And you tried to start a bank. Is that—am I right about that
at one point?

A. I've been on four banks boards, and I did try to start a bank
once.

Q. Okay. And so have—so you're familiar with that. You're
familiar with why that rule exists? Do you have an opinion?

A. Yes. I think I'm very familiar.

Q. Why?

A. It—to stop the drug dealers and the money launderers from
international.

Q. To—

A. And it's only a rule. It's not—you know, that transaction
report doesn't go anywhere. It just goes in a file in the
bank.

185. On information and belief, Defendants—particularly Bill McKelvy, Johnny
Kincey, Dennis McKelvy, and Rupert Philips—knew it was illegal to structure transactions—
*i.e.*, to break up a single transaction above the reporting threshold into two or more separate
transactions—for the purpose of evading a financial institution's reporting requirement (*i.e.*,
BancorpSouth with respect to these transfers). On information and belief, Defendants—
particularly Bill McKelvy, Johnny Kincey, Dennis McKelvy, and Rupert Philips—knew that a
person willfully violating this anti-structuring provision is subject to criminal penalties.

## VII.   Bill and Janet McKelvy Make Multiple Subsequent Transfers Of Cash From The GenFive Account.

186. As described in detail above, Bill and Janet McKelvy directed the transfer of
millions of dollars from the GenFive Account, with such transfers totaling in excess of $2.4
million from January 2011 to August 2016. Bill and Janet McKelvy orchestrated a systematic
series of transfers from the GenFive Account, with over $2,445,801 paid by check.

368429.19

187.    Besides withdrawing money in the form of checks, Bill and Janet McKelvy also directed transfers to third parties for which GenFive received no consideration.

188.    GenFive transferred funds it had received through fraudulent transfers from Bill and Janet McKelvy to certain Defendants, each of which was a subsequent and/or final transferee. Those transfers, during the period from August 5, 2011 to January 19, 2016, totaling $1,363,180 from the GenFive Account to other Defendants are as set forth on **Exhibit 4** hereto (which is incorporated herein by reference) (the "GenFive Check Transfers").

189.    By way of summary, Bill and Janet McKelvy directed the following total transfers to each Defendant:

   a.   $57,000 to Janet McKelvy;

   b.   $21,503.26 to Crystal McKelvy;

   c.   $24,000 to Mike Ward;

   d.   $120,000 to Craig Shaw; and

   e.   $105,444.12 to BancorpSouth;

190.    As a result of the foregoing, each of the foregoing Defendants referenced above is a subsequent and/or final transferee of funds from Bill and Janet McKelvy, and such subsequent transfers to each of the foregoing Defendants was a part of (and referred to herein as) the GenFive Deposit Transfers.

## VIII.    Bill and Janet McKelvy Utilize the Unlawfully Obtained Cash to Fund Illegal Investments and Operation, Including Investments in a Philippine Gold-Mine and the Acquisition of Counterfeit Money.

191.    As described above, Bill and Janet McKelvy have orchestrated the withdrawal of over $1.2 million in cash (*see* Ex. 3). On information and belief, Bill and Janet McKelvy,

with the knowledge and the assistance of Defendants, utilized most if not all of this cash as part of their unlawful scheme to make unlawful investments and obtain counterfeit currency.

192.   During his testimony, Bill McKelvy testified that he transferred a significant part of the cash withdrawn from the GenFive Account to fund his investment in a Philippine gold-mining operation coordinated by Chaim Hershkowits.  In notes obtained from Bill McKelvy's home, it appears that Bill McKelvy may have invested over $740,000 in the gold mine.  Dennis McKelvy corroborated Bill McKelvy's testimony, stating that, with respect to GenFive, "[w]e've got some money in the Philippines that's been there a long time and we've put some more money into the Philippines."

193.   On information and belief, Chaim Hershkowits is an operator and investor in business enterprises throughout the world.  Chaim Hershkowits is a former Destin resident who now lives in Israel, South Africa, and/or the Philippines.  Bill McKelvy first met Chaim Hershkowits when Bill McKelvy was developing "t-shirt stores" for Chaim Hershkowits and his investors in the State of Florida.

194.   At the direction of Chaim Hershkowits, Bill McKelvy made numerous cash investments in a Philippine gold-mining operation, with much of the funds invested into the business picked up by unknown couriers.  By way of example, Bill McKelvy testified that he transferred $65,000 cash to an unknown courier who he met in a Wal-Mart store.  The cash was carried in a plastic grocery bag and was simply handed to a man that Bill McKelvy said he had never met, but that "looked like all of them" (referring to individuals from the Middle East).  On information and belief, Bill McKelvy delivered funds to Chaim Hershkowits in this manner on numerous occasions.

368429.19

195.    On or about October 30, 2009, Bill McKelvy and Mike Ward formed or directed the formation of Precious Metals, a Florida corporation. Initially, Bill McKelvy was the sole officer of Precious Metals. On or about March 22, 2012, Bill McKelvy directed his attorney, Ryan M. Mynard, to change the officers of Precious Metals and to designate Mike Ward as the sole officer of Precious Metals.

196.    On information and belief, Bill McKelvy made such changes to hide his ownership interest in Precious Metals. On information and belief, Precious Metals continues to be involved in the Philippine gold-mining operation as one of the entities used by Defendants for investment purposes.

197.    On or about November 17, 2009, Mike Ward and Bill McKelvy formed, or directed the formation of, Beach Metals, a Florida corporation. Initially, and as of at least April 28, 2011, Mike Ward and Bill McKelvy were both officers of Beach Metals. On or about February 5, 2013, Bill McKelvy directed Ryan Mynard to change the registered agent of Beach Metals and to designate Mike Ward as the sole officer of Beach Metals. As of the date hereof, Beach Metals remained active and in good standing in the State of Florida.

198.    On information and belief, Bill McKelvy made such changes to hide his ownership interest in Beach Metals. On information and belief, Beach Metals continues to be involved in the Philippine gold-mining operation as one of the entities used by Defendants for investment purposes.

199.    On or about November 17, 2009, Bill McKelvy and Chaim Hershkowits formed, or directed the formation of, Eastern Metals, a Florida corporation. Initially, Chaim Hershkowits and Bill McKelvy were both officers of Eastern Metals.

200.    On information and belief, Eastern Metals continues to be involved in the Philippine gold-mining operation as one of the entities used by Defendants for investment purposes.

201.    On or about November 2, 2009, Bill McKelvy opened an account with CCB for Precious Metals.  On or about April 19, 2010, Bill McKelvy directed the transfer of $115,000 from the Precious Metals account, described as "Wire Out—Chaim Hershkowits/HSBC Philippines Account," per CCB bank records.  To complete the transfer, JTA transferred $115,000 into the Precious Metals account (by wire), on April 16, 2010.

202.    On or about April 22, 2011, Leon and Sandra Daggs transferred, by personal check, the sum of $100,000 to Precious Metals.  On or about April 27, 2010, Precious Metals signed over and transferred these funds to Blackwater.

203.    On information and belief, these transfers of funds involving JTA, Precious Metals, and Blackwater were made in furtherance of Defendants' unlawful scheme to, among other things, make unlawful, unreported foreign investments.

204.    On information and belief, no documents were exchanged between Chaim Hershkowits and Defendants, including Bill McKelvy, Beach Metals, Eastern Metals, or Precious Metals (or any of their related entities) to memorialize such transfers of cash to fund the Philippine gold-mining operation.  On information and belief, Bill McKelvy never reported any of these international transfers or investments with the relevant branches of the U.S. federal government or the Philippine government.  On information and belief, none of these investments have been disclosed in Bill McKelvy's financial statements and taxes (or the financial statements or taxes of GenFive).  On information and belief, Bill McKelvy's

international cash transfers were made in furtherance of Bill and Janet McKelvys' scheme to conceal assets from their legitimate creditors.

205.    On information and belief, in addition to utilizing the cash withdrawn from the GenFive Account to fund the Philippine gold-mine operation, Defendants also utilized these funds to make other improper investments and obtain counterfeit funds.

206.    On October 7, 2015, the Sheriff for Covington County, Alabama, served Writs of Execution on Bill and Janet McKelvy at their Andalusia residence in favor of Plaintiff. At the time of the execution, Bill and Janet McKelvy informed the Sheriff that they only had just over $200 in cash at the property and in their vehicles.

207.    Despite this claim, Bill and Janet McKelvy should have had access to at least $30,000 in cash. On October 5, 2015, Janet McKelvy cashed a $3,000 check at BancorpSouth in Greenville;on October 9, 2015, Janet McKelvy cashed an $8,500 check at BancorpSouth. In September 2015, Bill and Janet McKelvy negotiated six checks for cash totaling $21,600 at BancorpSouth.

208.    In connection with their search, and over the strong protest of Bill McKelvy, the Sheriff took possession of three $10,000 bills that the U.S. Secret Service later confirmed were counterfeit. The actual bills found in Bill McKelvy's desk are in the custody of the U.S. Secret Service.

209.    In addition to counterfeit bills, during the October 7, 2015 execution, Plaintiff discovered evidence of other illegal, unlawful, and/or unreported investments and activities, including transfers of cash to the Philippines and tax evasion

368429.19

IX.   **Mike Ward is an Instrumental Part of the Unlawful Scheme, Working Closely with Bill and Janet McKelvy, to Hide Their Assets from Creditors.**

210.   Mike Ward and Bill McKelvy attended high school together, with both graduating from Pensacola High School, Pensacola, Florida in 1962. At all relevant times, Mike Ward has been a close friend and business associate of Bill and Janet McKelvy and their related entities.

211.   On February 28, 2000, Mike Ward was convicted and sentenced to prison for money laundering, bank fraud, attempting to evade and defeat income taxes due and owing to the United States, among other things, in the United States District Court for the Middle District of Florida and owed $1,242,274 in restitution to the Cape Coral Medical Center, Inc.

212.   In 2006, Mike Ward left federal custody. Thereafter, he moved in and resided with Bill McKelvy and Janet McKelvy, first in Hope Hull, Alabama, and eventually in Andalusia, Alabama.

213.   While he was in prison, following his release, and presently, Mike Ward used Bill McKelvy's Baker P.O. Box for his personal and business affairs.

214.   On information and belief and as part of Bill McKelvy and other Defendants' unlawful scheme, Bill McKelvy transferred and conveyed assets and property interests to Mike Ward or companies that Mike Ward controls for no consideration. In addition to Blackwater, on information and belief, Mike Ward assisted Bill McKelvy with other aspects of Defendants' unlawful scheme.

### A. *Mike Ward Operates Beach Metals with Bill McKelvy.*

215.   On November 17, 2009, attorney Ryan Mynard formed Beach Metals at the direction of Mike Ward. At all times, Mike Ward was the ninety-five percent (95%) owner of

Beach Metals, with, on information and belief, Bill McKelvy owning the remaining five percent (5%).

216.   Mike Ward testified that whenever he "went into the oil business, [he] used it as the entity to get paid from. McKelvy was only on that because if anything ever happened to [him], then he would handle any of the proceeds that were there. [Bill McKelvy] never was paid anything." Mike Ward testified that Beach Metals performed oil drilling services (referred to as "wildcatting") in 2009, 2010, 2011, and 2014.

217.   Despite claiming that Bill McKelvy had no "real" interest in Beach Metals, in November 2009, Bill McKelvy opened an account for Beach Metals at CCB.

218.   Moreover, despite claiming that Bill McKelvy had no involvement with Beach Metals, in April 2010, Bill McKelvy—through JTA—transferred the sum of $21,000 to Mike Ward.

219.   On information and belief, Bill McKelvy (through JTA and later GenFive), provided financing and other services to Beach Metals, in exchange for compensation and/or a return on the investment from Beach Metals to Bill McKelvy, which were subsequently deposited in the GenFive Account.

### B.   Mike Ward Acquires Three Notch Property for the Benefit of Bill and Janet McKelvy.

220.   On April 19, 2012, Mike Ward formed JMW of Andalusia at the direction of Bill and Janet McKelvy. Mike Ward is the sole member of JMW of Andalusia, though Bill McKelvy actively participates in the management of the company. JMW of Andalusia's mailing address is Bill McKelvy's post office box in Baker, Florida.

368429.19

221.    On or about March 6, 2013, Mike Ward, through JMW of Andalusia, acquired a property commonly known as 502 East Three Notch Street, Andalusia, Alabama (the "Three Notch Property").[11]  In the real estate sales validation form recorded with the warranty deed transferring the property, JMW of Andalusia reported a purchase price for the sale of property of $155,000, and listed its mailing address as the exact same address as Bill McKelvy (i.e., the Baker P.O. Box).

222.    On or about February 20, 2015, JMW of Andalusia transferred the Three Notch Property directly to Mike Ward by Warranty Deed dated February 19, 2015.  At the time of this conveyance—and two years after transferring the Three Notch Property for $155,000—Mike Ward listed the market value of said property as $78,780.

223.    Despite the fact that Bill McKelvy allegedly had no interest in the Three Notch Property or JMW of Andalusia, he nevertheless executed the February 2015 Deed as the "Manager" of JMW of Andalusia.  His execution of the deed illustrated the control he had (and has) over JMW of Andalusia and Mike Ward.

224.    During the intervening months from March 2013 to February 2015, Mike Ward allegedly borrowed funds from Bill McKelvy—through GenFive—to fund construction on the Three Notch Property.

225.    Mike Ward, in describing the loans in recent testimony, stated that the "purpose of those loans was I was restoring a property.... And Generation Five, you know, gave—gave me a short-term loan to complete that as it went.  And then I—I would—I repaid them."  With

---

[11]     While the deed transferring said property to JMW of Andalusia was dated December 27, 2012, said deed was not recorded until March 6, 2013 in Covington County, Alabama.

368429.19

respect to the repayment of said loans, Mike Ward testified that: "And the work would go for—till the end of the month, and then I would repay them at the—at the end of the month for whatever that amount was." As Mike Ward testified on November 30, 2016:

> Q: How did you pay Generation Five back for the loans that they made to you?
> A: I wrote a check.
> Q: Were the—would these checks have been to Generation Five?
> A: Yes.
> Q: Would these checks have come from Blackwater's account?
> A: No.
> Q: So all the payments would have come from an account that either you owned or an entity that you owned [controlled?]
> A  Yes.

226. While Mike Ward described these transfers as "loans" on *his* "restoration" project, on information and belief, Mike Ward was actually completing repairs and otherwise renovating the Three Notch Property for the benefit of Bill and Janet McKelvy. On information and belief (and as otherwise corroborated by Sarah Tinklepaugh based on her conversations with Bill McKelvy), Bill and Janet McKelvy intended to move into the Three Notch Property on its completion.

227. Bill and Janet McKelvys' intention to move into the Three Notch Property was further supported by various items of furniture, fixtures, and art located within the Three Notch Property. On information and belief, Bill McKelvy and Mike Ward arranged to have certain furniture, fixtures, antiques and artwork *originally* located in Bill and Janet McKelvys' Baker, Florida mansion transported to and reinstalled in the Three Notch Property.

228. Mike Ward's claim that Bill McKelvy—through GenFive—lent him money to develop the Three Notch Property is unsupported by both the actual financial transactions

that occurred through the GenFive Account and Bill McKelvy's role as the primary contractor on the property.

229.    From March 2013 to February 2015, GenFive transferred the sum of $35,000 to JMW of Andalusia and/or Mike Ward.  From December 2013 to February 2015, Mike Ward and/or JMW of Andalusia transferred the sum of $235,000 to GenFive or Bill McKelvy (together the "JMW Transfers").

230.    Consequently, Mike Ward and/or JMW of Andalusia transferred $200,000 *more* to GenFive than GenFive transferred to JMW of Andalusia and/or Mike Ward.  If GenFive had only made, and Mike Ward and JMW of Andalusia had only repaid, loans to construct the Three Notch Property, then the amount of money exchanged by the parties should be equal.

231.    Mike Ward's claim that *he* was restoring the Three Notch Property is also unsupported by the fact that he hired Bill McKelvy—whose experience was as a contractor, a builder, and a developer—to oversee the construction and restoration of the Three Notch Property.

### C.    Mike Ward Utilizes GFFG Florida to Further the Unlawful Scheme with other Defendants.

232.    On or about December 3, 2012, Mike Ward directed attorney Ryan Mynard to form GFFG Florida.

233.    In forming the entity, Mike Ward testified that he formed it "to include an entity that would include my children in case I was successful in doing some business, that they would be involved in it."  While he was the initial owner, Mike Ward testified that "it never—it never did anything.  It's an—it's what do you call, an inactive corporation.  Never had a checkbook. Never had an account, nothing."

368429.19

234.    Of course, the name of GFFG Florida – or Generation Five Financial Group of Florida—bears a striking resemblance to Bill McKelvy's "vehicle" for fraud—Generation Five Financial Group (of Alabama).  In his recent testimony, Mike Ward stated that the mutual accountant of Mike Ward and Bill McKelvy—Daniel Bowers—suggested using the name Generation Five Financial Group of Florida.  Much like GenFive, on information and belief, Mike Ward utilized GFFG Florida to orchestrate his fraudulent endeavors.

235.    Despite his claim that it never did any business, Mike Ward nevertheless ensured that GFFG filed annual reports.  On information and belief, Mike Ward filed annual reports in 2013 and 2015 because GFFG Florida received income during those years.

236.    On or about September 7, 2001, Chaim Hershkowits formed A&CH LLC, a Florida limited liability company.  Pursuant to the Florida Secretary of State, the registered agent and manager of A&CH LLC is Defendant Chaim Hershkowits.   Nancy M. Hershkowits—who, on information and belief, is the estranged wife of Chaim Hershkowits, also serves (or served) as a manager of A&CH LLC.

237.    On or about November 30, 2012, Defendant Chaim Hershkowits—on behalf of A&CH LLC—executed that certain Promissory Note made by A&CH LLC in favor of GFFG Florida in the original principal amount of $340,000.

238.    On information and belief, A&CH LLC made payments to GFFG Florida and/or Mike Ward under the November 30, 2012 promissory note beginning in 2013.

239.    Despite loaning $340,000 to an entity managed and (presumably) owned by Defendant Chaim Hershkowits, Mike Ward testified on January 14, 2016 that he had little or no contact with Chaim Hershkowits:

> Q: Now, have you ever met a Chaim Hershkowits?
> A: Yes.
> Q: When did you meet Mr. Hershkowits?
> A: I don't remember. It could be—I mean I wouldn't have met
>    him until after 2012.
> Q: Now, have you met him more than once?
> A: No, I don't think so.
> Q: Have you talked to him more than once?
> A: Not that I recall.

240.    More suspiciously, Mike Ward denied that he ever did business with Chaim

Hershkowits:

> Q: Have you personally ever had any business dealings with Mr.
>    —Mr. [Hershkowits]?
> A: No.
> Q: What about any of your entities, have they ever done
>    business with Chaim?
> A: No.

241.    In sum, either Mike Ward lent Chaim Hershkowits $340,000 (and never spoke

to him again) or Mike Ward was evasive and untruthful with respect to his recent testimony.

Nevertheless, the aforementioned demonstrates that Mike Ward was an integral part of Bill

McKelvy's schemes involving Blackwater, Three Notch Properties, and Chaim Hershkowits.

242.    On information and belief, despite his claims to the contrary (and alleged lack

of knowledge about the gold-mining operation), Mike Ward has been intimately involved in

Bill McKelvy and other Defendants' unlawful scheme.

243.    On information and belief, Mike Ward has used knowledge gained from his

time in federal custody to assist Defendants with the unlawful operations and money

laundering.  On information and belief, Mike Ward has specifically assisted Bill McKelvy with

respect to Defendants' investments in Chaim Hershkowits' Philippine gold mine and arranging

for the transfer of funds to Chaim Hershkowits and his agents.

244.    On information and belief, Mike Ward consistently assisted Bill and Janet McKelvy with respect to the withdrawal of funds from the GenFive Account. On information and belief, Mike Ward has provided Bill and Janet McKelvy with knowledge and information utilized by Defendants to formulate their fraudulent scheme. On information and belief, Mike Ward has provided such advice and other services to Bill and Janet McKelvy and other Defendants in exchange for his ownership interest in Blackwater and his receipt of distributions from Blackwater.

## X.    Johnny Kincey Utilizes His Role at BancorpSouth To Assist with Bill and Janet McKelvys' Unlawful Scheme.

### A. Johnny Kincey and BancorpSouth Assist Bill and Janet McKelvy with Numerous Banking Transactions.

245.    As described above, Johnny Kincey's role at BancorpSouth was crucial to Bill and Janet McKelvys' scheme of depositing checks and withdrawing cash.

246.    On May 5, 2016, Johnny Kincey appeared for a deposition as a corporate representative of BancorpSouth. During that deposition, Johnny Kincey confirmed that he—and BancorpSouth—were aware of and understood the bank reporting requirements under 31 C.F.R. § 103.22(a) and 1010.311 and 31 U.S.C. § 5313(a) with respect to transfers made in excess of $10,000:

> Q. What is a currency transaction report?
> A. Currency transaction report is something that is filed by the tellers when they have a suspicion of a transaction. It could be of any amount. Once it reaches a certain amount, though, it automatically triggers that report.
> Q. What is that amount?
> A. I believe it's $10,000.
> Q. So if any of the checks in Exhibit 7 had been written to cash for over $10,000, would a CTR have to be—

> A. I believe that is the teller policy. I don't know teller policy
> verbatim, but I believe that is the teller policy.
> Q. And that's a bank policy?
> A. That's a bank policy. Thanks for correcting me.

247.    During that same deposition and as an individual and a representative of

BancorpSouth, Johnny Kincey admitted that he brought the McKelvy relationship to

BancorpSouth. Johnny Kincey also recognized that Bill and Janet McKelvy banked at a branch

of BancorpSouth many miles from their home, solely because of Johnny Kincey's role as an

employee, and Vice President, at BancorpSouth.

248.    During the same deposition, Johnny Kincey recalled receiving calls from the

Greenville, Alabama branch in which Bill and Janet McKelvy deposited checks and withdrew

cash:

> Q. How did the Greenville branch know to call you about
> this—about the checks?
> A. Well, because they knew I—my relationship with Bill and
> they would have called me, that I knew Bill McKelvy. Or he
> may have said that I— you can call Johnny; Johnny knows me. I
> don't know how it got back to me. But they probably called the
> branch and the branch – more than likely what probably would
> have happened they would have called the branch and asked
> .something about it, and they said, well, you need to talk to
> Johnny.

249.    Johnny Kincey also admitted that Bill and Janet McKelvys' deposits into and

the cashing of checks out of the GenFive Account—in the amounts and with the frequency

described herein—constituted suspicious activity. But, because of his relationship with Bill

and Janet McKelvy, such activities were "okay" from his perspective, particularly given Bill

McKelvy's reputation as a person who utilized cash on a daily basis to accomplish his business.

250.     On information and belief, Johnny Kincey, Bill McKelvy, Janet McKelvy and certain other Defendants worked collectively to avoid these reporting requirements by structuring withdrawals below the federal statutory reporting requirement of $10,000.

251.     In August 2010, Janet McKelvy opened a credit card with BancorpSouth. On information and belief, Johnny Kincey assisted Janet McKelvy in opening this credit card account.

252.     From June 2012 to November 2015, GenFive transferred the sum of $45,861.93 to BancorpSouth.    On information and belief, GenFive transferred such amounts to BancorpSouth in payment on Janet McKelvy's BancorpSouth credit card.

253.     On information and belief, Bill and Janet McKelvy used this credit card in connection with the scheme to transfer money from various accounts, and to effectuate the overall concealment of assets.  On information and belief, this card is currently being used to facilitate transferring funds between various Defendants.

### B.     HCB Financial's Purchase of CCB Judgment.

254.     Johnny Kincey also provided assistance to Bill and Janet McKelvy when they needed to acquire a judgment to "protect" their assets from Plaintiff's post-judgment collection activities.    As described in more detail below, Johnny Kincey arranged for BancorpSouth to provide a loan to Crystal McKelvy to allow Rupert Phillips to acquire a judgment from CCB.

255.     On information and belief, Johnny Kincey was aware of, and facilitated, Bill McKelvy's shielding of assets through various transfers to entities in which Bill McKelvy had

368429.19

a controlling or ownership interest, or, to persons who were close friends or family members and in connection with of HCB Financial's purchase of the CCB Judgment (*infra* Section XI).

### C.    In Addition To Assisting Defendants With BancorpSouth, Johnny Kincey Has A Separate Business Relationship with Blackwater.

256.    In addition to his relationship with Bill McKelvy through BancorpSouth, Johnny Kincey also assisted Bill McKelvy with the Blackwater claims business. As Johnny Kincey described it, "I was a referring…agent. I refer people to them. … I pretty much referred them to a few clients …." As "compensation" for such referrals, Blackwater paid Johnny Kincey a percentage of recoveries on amounts recovered on such referred claims, and Johnny Kincey received several checks from Blackwater.

257.    On information and belief, Johnny Kincey also received compensation for any claims submitted and any recoveries made by Blackwater on claims originating in the Auburn, Alabama. In other words, even if Johnny Kincey did not originate a lead coming from the Auburn, Alabama area, he still received compensation as Blackwater's "referring agent" in this market.

258.    On information and belief, Johnny Kincey obtained "generous" financial payments from Blackwater as compensation for his role in assisting Bill McKelvy, Janet McKelvy, and the other Defendants with their fraudulent scheme.

259.    In 2013, Johnny Kincey received $20,054.00 from Blackwater; in 2014 Johnny Kincey received $8,493.00 from Blackwater.

#### D.    *BancorpSouth Benefitted from Facilitating Defendants' Unlawful Scheme.*

260.    At all relevant times and on information and belief, BancorpSouth benefitted from the numerous transactions facilitated by Johnny Kincey, which, upon information and belief, would result in fees collected for BancorpSouth that it otherwise would not have realized.

261.    At all relevant times and on information and belief, BancorpSouth, as a commercial bank, benefitted by holding the GenFive Account, which had a large average daily balance (in excess of $22,159 per day during the period from January 2011 to March 2016). With more funds in its possession, BancorpSouth was able to extend more credit, earn more interest, and generally further its business as a banking institution.

262.    At all relevant times and on information and belief, BancorpSouth benefitted from the credit card transactions it facilitated with Janet McKelvy's BancorpSouth card and the Square Donut credit card, discussed in more detail infra Section XII. At all relevant times and on information and belief, BancorpSouth earned fees for these credit card transactions and deposit transactions.

## XI.    Rupert Phillips Assists Defendants with the Unlawful Scheme, Including the Acquisition of a Judgment as a Means To Protect Defendants from Bill McKelvy's Creditors.

263.    At the time he directed the transfers to Bill McKelvy from HCB Financial and Green Energy, Rupert Phillips claimed that Bill McKelvy had no assets and was destitute.

264.    Nevertheless, in January 2016—within eleven (11) months of the transfer of $40,000 from Green Energy to Bill McKelvy and a few short weeks after Plaintiff's investiture of Bill McKelvy's business records in Alabama—Rupert Phillips orchestrated the purchase of

368429.19

debt against Bill McKelvy and called it a "good investment." As he had done with his own businesses, however, Rupert Phillips purchased the CCB Judgment as a means to insulate Bill McKelvy from his legitimate creditors.

265.    Previously, CCB made certain loans to JTA, which loans were personally guaranteed by Bill and Janet McKelvy. On or about April 11, 2011, CCB obtained a judgment against JTA, Bill McKelvy, and Janet McKelvy in the amount of $3,332,221.45 from the Circuit Court of Montgomery County, Alabama in the matter styled as *CCB Community Bank v Bill R. McKelvy, et al.*, Case No. CV 2011-398 (the "CCB Judgment"). Thereafter, CCB recorded the CCB Judgment in Montgomery, Covington, Butler, and Lowndes Counties in Alabama.

266.    On or about January 21, 2016, HCB Financial acquired the CCB Judgment (and all rights of CCB under any loan documents by JTA, Bill McKelvy, and Janet McKelvy in favor of CCB) from CCB for the sum of $75,000. Rupert Phillips signed the Transfer and Assignment of Judgment between CCB and HCB Financial as a director of HCB Financial.

267.    In connection with the acquisition of the CCB Judgment by HCB Financial, Bill McKelvy, Janet McKelvy, and JTA consented to the transfer and arranged for a separate payment of $25,000 to CCB to complete the transfer and induce CCB to enter into the transaction with HCB Financial.

268.    To obtain the funds to pay this $25,000 in connection with the loan acquisition by HCB Financial, Crystal McKelvy obtained a loan from BancorpSouth. BancorpSouth subsequently transferred the loan proceeds to CCB to allow McKelvy and Phillips to complete their transaction with CCB.

368429.19

269.    On information and belief, Johnny Kincey obtained this loan on behalf of Bill McKelvy, and only made the loan to Crystal McKelvy as a means to hide the loan and its corresponding transactions from Bill McKelvy's other creditors.

270.    On information and belief, Bill McKelvy provided Crystal McKelvy with funds to be deposited with BancorpSouth for purposes of obtaining and collateralizing the loan from BancorpSouth to Crystal McKelvy.

271.    On information and belief, Crystal McKelvy lacked the wherewithal to obtain this BancorpSouth loan based on personal financial history and personal assets.

272.    On information and belief, Crystal McKelvy never handled, used, or directed the use of the loan proceeds; she merely signed a document that BancorpSouth, Johnny Kincey, and Bill and Dennis McKelvy told her to sign.  BancorpSouth, through Johnny Kincey, directed the funds to CCB in the form of an official cashier's check to consummate the acquisition of the CCB Judgment by HCB Financial.

273.    On information and belief, Bill McKelvy orchestrated the acquisition of the CCB Judgment by Rupert Phillips and HCB Financial.  Their acquisition of the CCB Judgment occurred just over one month after Plaintiff recovered certain documents and assets from the rental home of Bill and Janet McKelvy—even though CCB had held said judgment since 2011 and was not actively attempting to collect upon the judgment.

274.    Bill McKelvy's control of the transfer of the CCB Judgment—all of which involved Rupert Phillips, HCB Financial, and Crystal McKelvy—was done to obtain an enforceable judgment and related judgment liens that would take a priority over Bill McKelvy's valid creditors, thus, defrauding Bill McKelvy's creditors (including Plaintiff).

368429.19

275.   Rupert Phillips and HCB Financial purchased the CCB Judgment in furtherance of Bill and Janet McKelvys' scheme to defraud their creditors.  Rupert Phillips was well aware of Bill and Janet McKelvys' scheme to defraud their creditors and actively participated in the purchase of the CCB Judgment on behalf of HCB Financial.

276.   On information and belief, Bill and Janet McKelvy wanted Rupert Phillips to acquire the judgment so that none of Bill and Janet McKelvys' creditors would know that they themselves orchestrated the acquisition of the judgment.  On information and belief, Rupert Philips agreed to acquire the CCB Judgment as a means to protect his own investments (personally and through HCB Financial and Green Energy) in Bill and Janet McKelvys' unlawful scheme.

## XII.   Dennis McKelvy and Square Donut Are an Active Part of the Unlawful Scheme.

277.   Dennis McKelvy actively assisted Bill and Janet McKelvy in concealing their assets (including his actual ownership and control of GenFive and the GenFive Account) and transferring funds from the GenFive Account.  In addition to and, on information and belief, compensation for such efforts, Bill and Janet McKelvy utilized fraudulently obtained money to, among other things, fund Dennis McKelvy's donut business, Square Donut.

### A.  Dennis McKelvy "Acts" as Manager of JTA and GenFive.

278.   Despite claiming ignorance with respect to his knowledge of the operations of JTA and GenFive, Dennis McKelvy acts as, and is, a manager of GenFive.  Dennis McKelvy admitted that he was often an officer of his father's companies and acted on their behalf.  By way of example:

69

a. On or about June 10, 2012, Dennis McKelvy executed a deed from JTA in favor of Eugene C. Mayhew, thereby transferring certain property located in Okaloosa County, Florida. Originally, Bill and Janet McKelvy had transferred said property to JTA on November 25, 2008. Since February 19, 2011, Wilda Mayhew (Eugene Mayhew's mother) has paid money owed to JTA for the sale of said property directly to GenFive.

b. On or about February 17, 2015, Dennis McKelvy executed a deed from GenFive in favor Rowell/Bingham Farms, Inc. as to property commonly known as 5375 Griffin Mill Road, Baker, Florida. GenFive had initially transferred this property to Rowell/Bingham Farms on or about May 23, 2012. Previously, Bill and Janet McKelvy JTA had originally transferred said property to GenFive on or about March 19, 2012, for no consideration. On or around June 4, 2012, Rowell/Bingham Farms paid funds related to this transaction directly to GenFive and the GenFive Account.

279. In acting as an officer of his father's entities, Dennis McKelvy not only signed numerous checks for his father, but he also assisted with real estate transactions involving GenFive or JTA properties. Dennis McKelvy played, and continues to play, an active role in Bill and Janet McKelvys' unlawful scheme.

### B. Bill McKelvy Assists Dennis McKelvy with Opening and Financing Square Donut's Operations.

280. On or about March 5, 2009, Bill and Dennis McKelvy executed a Lease Agreement with Tiger Crossing, an Alabama general partnership, with respect to property commonly known as 1625 East University Drive, Auburn, AL 36830. Bill and Dennis McKelvy have subsequently renewed this lease on two occasions, with the term of the Lease now running through December 31, 2018.

281. At the time the lease was executed, Bill and Dennis McKelvy intended that Dennis McKelvy would own and operate Square Donut at this location.

282. On or about March 24, 2009, Dennis McKelvy and/or Bill McKelvy directed Richard McBride to form Square Donut using the "JTA model" as further described below.

368429.19

Soon thereafter, Square Donut began operations at the property leased by Bill and Dennis McKelvy.

283.   At all relevant times to this Complaint and since its formation, Dennis and Crystal McKelvy have been employees of Square Donut and have exercised dominion and control over Square Donut.   At all relevant times to this Complaint and since its formation, Square Donut has operated a donut shop in Auburn, Alabama.

284.   In an email from Richard McBride to Dennis McKelvy dated March 5, 2009, Richard McBride states that he will use the "JTA model" with respect to ownership of Square Donut.  Dennis McKelvy testified that the "JTA model" meant "the kids owning the doughnut shop."

285.   On information and belief, when Dennis McKelvy began operations of Square Donut, he claimed to have no assets.   On information and belief, to form, construct, and operate Square Donut, Dennis McKelvy obtained funds from Bill McKelvy, funds that were originally fraudulently transferred to GenFive.

286.   When asked about the formation and initial operations of Square Donut during a deposition on June 27, 2016, Dennis McKelvy pled ignorance:

> Q. Why did you tell him to do that?
> A. Because it was their money.
> * * *
> Q. So tell me about that.  How much money was it?
> A. I don't know.
> * * *
> Q. Where was the money?
> A. Dad had it.
> * * *
> Q. Was it in the form of cash?  Was it in a bank account?
> A. I don't recall.
> * * *

Q. How much money? You don't remember?
A. I don't know.
Q. How did you get the money?
A. I don't recall.
Q. Why did you think it was the children's money?
A. That's what he told me.
***
Q. I'm sorry. Your children hadn't earned it. Your two children and Janet Sconiers, they hadn't earned it, had they?
A. They had had a bunch of money at one time. They hadn't gone out and gotten jobs, no. But they had some money put aside for a long time.
Q. Where?
A. I don't know.
Q. Do you have any records about that?
A. No.

287.    In addition to utilizing Square Donut to operate a donut shop, Defendants utilized Square Donut to hide their assets from their creditors.

288.    For example, in or around October 8, 2010, Janet McKelvy obtained a consumer loan from BancorpSouth in the original principal amount of $28,183.00. Thereafter, on or around April 22, 2011, Dennis McKelvy pledged the assets of Square Donut along with two vehicles believed to have been owned and operated by Dennis and/or Crystal McKelvy in conjunction with the renewal of this loan.

289.    On information and belief, Bill McKelvy—through JTA and GenFive—funded the opening and continued operations of Square Donut. On information and belief, Dennis McKelvy received periodic transfers from Bill McKelvy—through GenFive—for his role in assisting Bill McKelvy, Janet McKelvy, and the other Defendants with their fraudulent scheme.

72

368429.19

### C.   *Dennis McKelvy's Involvement with Other Associated Entities in Furtherance of the Unlawful Scheme.*

290.   Despite disclaiming ownership or involvement with NO Development, Bill and Dennis McKelvy continued to utilize the entity for certain purposes.

291.   Dennis McKelvy confirmed that NO Development employed him, and he served as an officer of NO Development. On April 21, 2011, Dennis McKelvy endorsed a check for $50,000—made payable to him—and deposited the check in an account held by NO Development. On information and belief, Dennis McKelvy transferred this sum to NO Development as a means to avoid utilizing such funds to pay his own creditors, including Plaintiff.

292.   During his examination on June 27, 2016, Dennis McKelvy testified that he carried an NO Development business MasterCard from FNBT Bank (of Fort Walton Beach, Florida)—which he received from Bill McKelvy—with an expiration date of February 2019.

### D.   *After Filing For Chapter 7 Bankruptcy Relief, Dennis McKelvy Hides His Ownership in Square Donut and His Involvement in GenFive.*

293.   Plaintiff is also a creditor of Dennis McKelvy. On or about August 11, 2011, Plaintiff obtained a judgment against Dennis McKelvy (resulting from a home mortgage loan it provided to him) in the amount of $681,050.50. Such judgment remains unpaid as of the date hereof.

294.   On March 31, 2014, Dennis McKelvy filed for Chapter 7 bankruptcy relief in the United States Bankruptcy Court for the Middle District of Alabama, initiating Case No. 14-80395.

295.    Despite his interests in Square Donut and GenFive, Dennis McKelvy attested, under oath, that he was not then employed—and had not been employed since in any manner 2011 and had no income.  He also attested, under oath, that he held no stock or interests in incorporated or unincorporated businesses, partnerships, or joint ventures.

296.    On October 21, 2014, the Court entered its Order granting Dennis McKelvy a discharge.  Dennis McKelvy, however, concealed his income and his interests in various properties and business entities (including Square Donut) from the bankruptcy trustee and his creditors, including Plaintiff.

297.    On October 20, 2015, Plaintiff filed a motion to re-open Dennis McKelvy's bankruptcy case and to revoke his discharge for, among other reasons, his failure to schedule his income from and ownership in Square Donut.  As of the date hereof, such proceeding remains pending.[12]

## XIII.    Bill and Janet McKelvy Seek to "Reclaim" Their Ownership Interests in JTA and GenFive.

298.    Bill and Janet McKelvy continue to operate and orchestrate their unlawful scheme, even though Bill McKelvy is the subject of a pending proceeding involving their ownership in Blackwater and the current judgment collection proceeding initiated by Plaintiff.

299.    In December 2016, Bill McKelvy approached their estranged, "adopted" daughter, Sarah Tinklepaugh and her ex-husband, Rob Sconiers, with respect to the alleged interests of their daughter, Janet Sconiers, in JTA and GenFive.

---

[12]    Because of the Dennis McKelvy's bankruptcy case, Plaintiff is not seeking to recover from Dennis McKelvy for any fraud or conspiracy that occurred prior to March 31, 2014 (when he filed his bankruptcy petition), based on the discharge he received during this case.  To the extent the Bankruptcy Court revokes Dennis McKelvy's discharge, Plaintiff reserves all rights.

300.    As part of their request, on information and belief, Bill and Janet McKelvy requested that Rob Sconiers (with respect to JTA) and Sarah Tinklepaugh (with respect to GenFive) transfer the alleged interests of Janet Sconier in each entity to Bill McKelvy.

301.    To memorialize these transfers, on information and belief, Bill McKelvy provided draft "Transfer and Assignment of Membership Interest" agreements to Sarah Tinklepaugh.   Under each such agreement, Janet Sconiers (through here custodians Rob Sconiers and Sarah Tinklepaugh) would assign her alleged interests in JTA and GenFive to Bill McKelvy.

302.    In exchange for such assignments, neither Janet Sconiers nor her custodians would receive any cash or similar consideration.

303.    Instead, the assignments required Janet Sconiers to release claims she might have against Bill McKelvy as the manager of the entities and assignee of Janet Sconiers' alleged interests.   The assignments also required Janet Sconiers to release claims she might have against Thomas and Addison McKelvy as other "members" of JTA and GenFive.

304.    On information and belief, Bill and Janet McKelvy has sought the transfer of these interests from Janet Sconiers and her custodians as a means to allow Bill McKelvy to "legally" control JTA and GenFive without the need for consent from Janet Sconiers, through her custodians. With the ability "legally" control JTA and GenFive, on information and belief, Bill and Janet McKelvy intend to pledge, assign or transfer the ownership interests in JTA and GenFive in furtherance of the unlawful scheme.

## COUNT I
## RICO VIOLATION UNDER 18 U.S.C. § 1962(c)
**(Against Bill McKelvy, A&CH LLC, BancorpSouth, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10)**

305. Plaintiff reasserts and incorporates by reference all of the foregoing allegations in paragraphs 1 through 304 in their entirety and further alleges:

306. This Count is against Defendants Bill McKelvy, A&CH LLC, BancorpSouth, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10 (the "Count I Defendants").

307. The Defendants' arrangement described herein constitutes an ongoing organization, with an ascertainable structure and purpose beyond the predicate acts and the conspiracy to commit such acts, by which the Count I Defendants functioned as a continuing unit comprised of said Count I Defendants.

308. The Count I Defendants associated themselves with each other to form an enterprise (the "McKelvy Enterprise") for the purpose of defrauding Plaintiff and other creditors of the ability to collect millions of dollars to which they were entitled by orchestrating a scheme to conceal assets from legitimate creditors by funneling them into GenFive and

76

investing cash withdrawals into foreign operations. The Count I Defendants knew that many of these transactions, including the structuring scheme set forth above, were likely to be challenged by the tax authorities and/or were illegal. The McKelvy Enterprise engaged in, and its activities affected, interstate commerce, including the provision of legal, financial and investment services across state lines.

309.    The Count I Defendants conducted or participated in the conduct of the McKelvy Enterprise's affairs through a pattern of racketeering activity consisting of, *inter alia*, more than two acts of mail fraud, wire fraud and engaging in monetary transactions in property derived from specified unlawful activity (in violation of, *inter alia*, 18 U.S.C. §§ 1341, 1343 and 1956, respectively). As part of this pattern, continuing over the course of several years, by using the mails, private interstate carriers and interstate wire communications, the Count I Defendants, through the McKelvy Enterprise, concealed assets from Plaintiff and other creditors beginning in 2010.

310.    In particular, without limitation, in violation of 18 U.S.C. §§ 1341 and 1343, Defendants employed the U.S. Postal Service and/or private or commercial interstate carriers and/or interstate wire communications to send their payment requests, invoices, retainer letters, and investment advice to the McKelvy Enterprise, and others, and to receive from others payments of the Count I Defendants' fees and earned income, all as set forth above.

311.    The McKelvy Enterprise is an enterprise engaged in and whose activities affect interstate commerce. At all relevant times, the Count I Defendants, among others unknown to Plaintiff, were and are employed by or associated with the McKelvy Enterprise.

312.   The Count I Defendants agreed to, and did conduct and participate in, the conduct of the McKelvy Enterprise's affairs through a pattern of racketeering activity that was devised by Bill and Janet McKelvy for the unlawful purpose to keep secret and hide assets, including cash reserves, which were owed to others, including the Plaintiff, and to hide ill-gotten gains for themselves and/or others associated with them, and was implemented by means of a wide array of schemes and devices that include many fraudulent or wrongful acts and omissions. As more specifically described above and below:

a.   Janet McKelvy, knowingly and directly or indirectly conducted the racketeering activities through the McKelvy Enterprise by directly or indirectly sending, or approving the sending of, fraudulent representations through the mail or by wire and directing Rupert Phillips and others to do so by virtue of her involvement in the operation or management of GenFive and as co-conspirator of the scheme.

b.   Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, and due to his involvement in the operation or management of GenFive and Square Donut, knowingly and directly or indirectly conducted the racketeering activities through the McKelvy Enterprise by directly or indirectly sending, or approving the sending of, fraudulent representations through the mail or by wire and directing Rupert Phillips and others to do so.

c.   Crystal McKelvy, due to her involvement in GenFive, Blackwater and purchase of the CCB Judgment, knowingly and directly or indirectly conducted the racketeering activities through the McKelvy Enterprise by directly or indirectly sending, or approving the sending of, fraudulent representations through the mail or by wire.

d.   Rupert Phillips, due to his involvement in the operation or management of HCB Financial, Green Energy and Phillips Capital, regardless of his title, knowingly and directly or indirectly conducted the racketeering activities through the McKelvy Enterprise by directly or indirectly sending, or approving the sending of, fraudulent representations through the mail and by wire and directing others to do so.

e.   Johnny Kincey, due to his involvement with GenFive and assistance in obtaining loans and accounts at BancorpSouth, regardless of his title, knowingly and directly or indirectly conducted the racketeering activities through the McKelvy Enterprise by directly or indirectly sending, or approving the sending

of, fraudulent representations by wire and directing employees of BancorpSouth and others, through the McKelvy Enterprise's chain of command, to do so.

f. Mike Ward, due to his involvement in the operation or management of Beach Metals, Precious Metals, Blackwater, JMW of Andalusia, and GFFG Florida, regardless of his title, knowingly and directly or indirectly conducted the racketeering activities through the McKelvy Enterprise by directly or indirectly sending, or approving the sending of, fraudulent representations by wire and directing attorney Ryan Mynard and others to do so.

g. Craig Shaw, due to his involvement in the operation or management of Blackwater, regardless of his title, knowingly and directly or indirectly conducted the racketeering activities through the McKelvy Enterprise by directly or indirectly sending, or approving the sending of, fraudulent representations through the mail and by wire and directing others to do so.

h. Chaim Hershkowits, due to his involvement in the operation or management of Eastern Metals and AC&H LLC, regardless of his title, knowingly and directly or indirectly conducted the racketeering activities through the McKelvy Enterprise by directly or indirectly sending, or approving the sending of, fraudulent representations through the mail and by wire and directing others to do so.

313.    The McKelvy Enterprise then embarked upon an ongoing scheme to hide the assets and/or to otherwise disguise the true use, source and ownership of the assets secreted away.  For example, as part of Bill and Janet McKelvys' money laundering activities, Bill and Janet McKelvy formed Defendant GenFive.  GenFive was then utilized as a pseudo-banking entity by the McKelvy Enterprise to comingle both the proceeds of its illicit activities with other legitimate payments, if any, and to allow for the disbursement of the proceeds of the McKelvy Enterprise's illicit activities to its members.

314.    By creating GenFive, the McKelvy Enterprise was able to receive payments from both legitimate vendors and from proceeds from certain foreign investments such as the gold mine investment.  In this way, the monies being distributed to the members of the

McKelvy Enterprise could be funded through GenFive into its checking accounts, and then be accessed through automated bank teller withdrawals and/or "cash" withdrawals.

315.    One example of such disbursements to a member of the McKelvy Enterprise was the over $775,000 in payments made to defendant GenFive by defendant Blackwater. On information and belief, McKelvy, was paid "off the books" through one of the GenFive accounts—although he was responsible for operating Blackwater and generating much of the revenue, and GenFive had no independent business operation.

316.    In addition to the activities of Blackwater, Bill and Janet McKelvy created a series of shell companies with no independent business operations. Defendants utilized these entities to hide assets and facilitate the negotiation of checks and other payment instruments in furtherance of the McKelvy Enterprise. These companies, which include Defendants GenFive and JMW of Andalusia, were created to expedite the clearance of checks and circumvent the location and recovery of assets by Bill and Janet McKelvys' many creditors, including Plaintiff.

317.    Bill and Janet McKelvys' efforts to hide and disguise assets involved at least some or all of the following methods:

   a.  Retitling assets into the names of nominees or other person controlled by Bill and Janet McKelvy or otherwise in league with Bill and Janet McKelvy;

   b.  Converting assets into other forms (*e.g.*, by converting hidden or secreted cash into other tangible assets, including by unlawful means);

   c.  Moving funds through a variety of intermediaries (including financial institutions such as BancorpSouth) both inside and outside the United States;

   d.  Some combination of all of the foregoing methods.

318.   Pursuant to and in furtherance of their fraudulent scheme, the Count I

Defendants committed multiple related unlawful acts and omissions of:

    a.   Obtaining money or property by means of false or fraudulent pretenses, representations, or promises, as described above, knowingly and willfully transmitted or caused to be transmitted by any private or commercial interstate carriers or took or received therefrom for (a) the purpose of executing such scheme, in violation of 18 U.S.C. § 1341, and for (b) the purpose of executing such scheme, through the transfer of monies, in violation of 18 U.S.C. § 1341;

    b.   Obtaining money or property by means of false or fraudulent pretenses, representations, or promises, as described above, knowingly and willfully transmitted or caused to be transmitted by means of a wire communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for (a) the purpose of executing such scheme, in violation of 18 U.S.C. § 1343, and for (b) the purpose of executing such scheme, through the transfer of monies, in violation of 18 U.S.C. § 1343;

    c.   Transporting, transmitting, or transferring in interstate or foreign commerce, monies of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud, which they knew to be stolen or taken by fraud, in violation of 18 U.S.C. § 2314;

    d.   Receiving, possessing, concealing, storing, bartering, selling, or disposing of money of the value of $5,000 or more, which crossed a state or United States boundary after being stolen, unlawfully converted, or taken, knowing the same to have been stolen, unlawfully converted, or taken, in violation of 18 U.S.C. § 2315;

    e.   Receiving, possessing, or concealing in interstate or foreign commerce, monies of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud, which they knew to be stolen or taken by fraud, in violation of 18 U.S.C. § 2315;

    f.   Traveling in interstate or foreign commerce or using the mail or any facility in interstate or foreign commerce, with intent to distribute the proceeds of an unlawful activity and to further an unlawful activity and otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, in violation of 18 U.S.C. § 1952;

    g.   Knowingly conducting and attempting to conduct financial transactions affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity, that is, the proceeds of one or more violations of 18

368429.19

U.S.C. §§ 1341 (mail fraud), 1343 (wire fraud), 1952 (travel in interstate and foreign commerce in aid of a racketeering enterprise), 2314 (transportation of stolen monies), and 2315 (receipt or possession of stolen monies), with the intent to promote the carrying on of specified unlawful activity, and knowing that the transaction was designed in whole or in part to conceal and disguise, the nature, location, source, ownership, and control of the proceeds of said specified unlawful activity and to avoid a transaction reporting requirement under State or Federal law, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transaction, represented the proceeds of some form of unlawful activity, in violation of 18 U.S.C. §§ 1956 (a)(1)(A)(i) or (B)(i) or (ii);

h.  Knowingly engaging and attempting to engage in monetary transactions by, through, or to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is, the deposit, withdrawal, transfer, exchange of U.S. Currency, funds or monetary instruments, such property having been derived from a specified unlawful activity, that is, the proceeds of one or more violations of 18 U.S.C. §§ 1341 (mail fraud) 1243 (wire fraud), 1952 (traveling in interstate or foreign commerce in aid of racketeering), 2314 (transportation of stolen monies), and 2315 (receiving or possessing stolen monies), in violation of 18 U.S.C. § 1957;

i.  Certain other acts of racketeering activity, including but not limited to, theft, mail fraud, wire fraud, interstate and foreign travel in aid of a racketeering enterprise, transportation of stolen monies, sale or receipt of stolen monies, laundering of monetary instruments, engaging in monetary transactions in criminally derived property of a value greater than $10,000 and other violations of federal law that occurred, but are currently unknown to Plaintiff. Each such act of racketeering activity constitutes a separate act in the pattern of racketeering activity in which the McKelvy Enterprise engaged; and

319.  The acts of, but not limited to: (i) transporting stolen monies in interstate or foreign commerce; (ii) engaging in the sale or receipt of stolen monies; (iii) engaging in mail fraud; (iv) wire fraud; (v) money laundering; (vi) traveling in interstate or foreign commerce and using the mail or any facility in interstate or foreign commerce; with intent to further racketeering activity; and (vii) engaging in monetary transactions in criminally-derived property over $10,000, in order to engage in the ongoing efforts to conceal, disguise, or launder the true source and ownership of money and assets through international cash transfers and other

means as set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

320.    The Count I Defendants have directly and indirectly conducted and participated in the conduct of the McKelvy Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

321.    As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in its business and property through its lost revenue in an amount to be proven at trial, and limited ability to extend credit to its customers from its inability to collect the millions of dollars of debt rightfully owed to it.

WHEREFORE, Plaintiff requests that this Court enter judgment against the Count I Defendants for actual damages, treble damages and attorney's fees (which were already incurred, and will be incurred in the future to continue unravelling the scheme).

368429.19

## COUNT II
## RICO VIOLATION UNDER 18 U.S.C. § 1962(a)
(Against Bill McKelvy, A&CH LLC, BancorpSouth, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10)

322.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 321 as if fully set forth herein.

323.    This Count is against Defendants Bill McKelvy, A&CH LLC, Bancorp South, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10 (the "Count II Defendants").

324.    The McKelvy Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

325.    The Count II Defendants used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise derived by Bill and Janet McKelvy for the unlawful purpose to secret and hide assets, including cash reserves, which were owed to others, including the Plaintiff, and to hide ill-gotten gains for himself and/or others associated with them, and was implemented by means of a wide array of schemes and devices

368429.19

that include many fraudulent or wrongful acts and omissions.  As more specifically described above and below:

    a.  Janet McKelvy, due to her involvement in the operation or management of GenFive, knowingly and directly or indirectly used and invested income derived from the racketeering activities through the McKelvy Enterprise and as co-conspirator of the scheme.

    b.  Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, and due to his involvement in the operation or management of GenFive, Square Donut and NO Development, regardless of his title, knowingly and directly or indirectly used and invested income derived from the racketeering activities through the McKelvy Enterprise.

    c.  Crystal McKelvy, due to her involvement in GenFive, Blackwater, regardless of her title, and the purchase of the CCB Judgment, knowingly and directly or indirectly used and invested income derived from the racketeering activities through the McKelvy Enterprise

    d.  Rupert Phillips, due to his involvement in the operation or management of HCB Financial, Green Energy, Phillips Capital, and Blackwater, regardless of his title, knowingly and directly or indirectly used and invested income derived from the racketeering activities through the McKelvy Enterprise.

    e.  Johnny Kincey, due to his involvement at BancorpSouth, regardless of his title, knowingly and directly or indirectly used and invested income derived from the racketeering activities through the McKelvy Enterprise.

    f.  Mike Ward, due to his involvement in the operation or management of Beach Metals, Precious Metals, Blackwater, and GFFG Florida, regardless of his title, knowingly and directly or indirectly used and invested income derived from the racketeering activities through the McKelvy Enterprise.

    g.  Craig Shaw, due to his involvement in the operation or management of Blackwater, regardless of his title, knowingly and directly or indirectly used and invested income derived from the racketeering activities through the McKelvy Enterprise.

    h.  Chaim Hershkowits, due to his involvement in the operation or management of Eastern Metals and AC&H LLC, regardless of his title, knowingly and directly or indirectly used and invested income derived from the racketeering activities through the McKelvy Enterprise.

368429.19

326. The racketeering activity of, but not limited to: (i) transporting stolen monies in interstate or foreign commerce, (ii) engaging in the sale or receipt of stolen monies, (iii) engaging in mail fraud, (iv) wire fraud, (v) money laundering, (vi) traveling in interstate or foreign commerce and using the mail or any facility in interstate or foreign commerce, with intent to further racketeering activity, and (vii) engaging in monetary transactions in criminally-derived property over $10,000, in order to engage in the ongoing efforts to conceal, disguise, or launder the true source and ownership of money and assets through international cash transfers and other means as set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

327. As a direct and proximate result of the Count II Defendants' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiff has been injured in its business and property through its lost revenue at an amount to be proven at trial, and limited ability to extend credit to its customers from its inability to collect the millions of dollars of debt rightfully owed to it.

WHEREFORE, Plaintiff requests that this Court enter judgment against the Count II Defendants including actual damages, treble damages and attorney's fees (which were already incurred, and will be incurred in the future to continue unravelling the scheme).

## COUNT III
## RICO VIOLATION UNDER 18 U.S.C. § 1962(b)
**(Against Bill McKelvy, A&CH LLC, BancorpSouth, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious**

**Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10)**

328.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 327 as if fully set forth herein.

329.    This Count is against Defendants Bill McKelvy, A&CH LLC, BancorpSouth, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10 (the "Count III Defendants").

330.    The McKelvy Enterprise is an enterprise engaged in and whose activities affect interstate commerce.

331.    The Count III Defendants acquired or maintained, directly and indirectly, an interest in and control of the McKelvy Enterprise through a pattern of racketeering activity.

332.    The racketeering activity of, but not limited to: (i) transporting of stolen monies in interstate or foreign commerce; (ii) engaging in the sale or receipt of stolen monies; (iii) engaging in mail fraud; (iv) wire fraud; (v) money laundering; (vi) traveling in interstate or foreign commerce and using the mail or any facility in interstate or foreign commerce; with intent to further racketeering activity; and (vii) engaging in monetary transactions in criminally-derived property over $10,000, in order to engage in the ongoing efforts to conceal, disguise, or launder the true source and ownership of money and assets through international cash

368429.19

transfers and other means as set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

333.    The Count III Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

334.    As a direct and proximate result of the Count III Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiff suffered injuries to its business in that it has been forced to expend thousands of dollars on investigating the scheme at large, time and effort into investigating the scheme at large, and has been robbed of its opportunity and ability to invest the amounts which were due and owing to it as of 2011.

WHEREFORE, Plaintiff requests that this Court enter judgment against the Count III Defendants as follows: actual damages in an amount to be determined at trial, including prejudgment interest, treble damages and attorney's fees (which were already incurred, and will be incurred in the future to continue unravelling the scheme).

## COUNT IV
## CONSPIRACY TO VIOLATE RICO UNDER 18 U.S.C. § 1962(d)
(Against Bill McKelvy, A&CH LLC, BancorpSouth, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10)

335.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 334 as if fully set forth herein.

368429.19

336.    This Count is against Defendants Bill McKelvy, A&CH LLC, BancorpSouth, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10 (the "Count IV Defendants").

337.    As set forth above, the Count IV Defendants agreed and conspired to violate 18 U.S.C. § 1962(a)-(c).  Specifically, the Count IV Defendants: (i) used or invested income that is derived from a pattern of racketeering activity in an interstate enterprise (§ 1962(a)); (ii) acquired or maintained interests in the McKelvy Enterprise through a pattern of racketeering activity (§ 1962(b)); or (iii) conducted and participated in the conduct of the affairs of the McKelvy Enterprise through a pattern of racketeering activity (§ 1962(c)).

338.    The Count IV Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the McKelvy Enterprise through a pattern of racketeering activity, conduct and participate in the conduct of the affairs of the McKelvy Enterprise through a pattern of racketeering activity.  The Count IV Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  The conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(a)-(c), in violation of 18 U.S.C. § 1962(d).

368429.19

339.     As a direct and proximate result of the Count IV Defendants' racketeering activities and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in its business and property through its lost revenue in an amount to be proven at trial, and limited ability to extend credit to its customers from its inability to collect the millions of dollars of debt rightfully owed to it.

WHEREFORE, Plaintiff requests that this Court enter judgment against the Count III Defendants including actual damages, treble damages and attorney's fees (which were already incurred, and will be incurred in the future to continue unravelling the scheme).

## COUNT V
### (MAIL FRAUD AND WIRE FRAUD-ALA. CODE § 6-5-370)
**(Against Bill McKelvy, A&CH LLC, BancorpSouth, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10)**

340.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 339 as if fully set forth herein.

341.     This Count is against Defendants Bill McKelvy, A&CH LLC, BancorpSouth, Beach Metals, Blackwater, Chaim Hershkowits, Craig Shaw, Crystal McKelvy, Eastern Metals, GenFive, GFFG Florida, Green Energy, HCB Financial, Dennis McKelvy, individually and as sponsor for James Thomas McKelvy and Addison McKelvy, Janet McKelvy, JMW of Andalusia, Johnny Kincey, Mike Ward, NO Development, Phillips Capital, Precious Metals, Rupert Phillips, Square Donut, Jane Does 1-10, and John Doe companies 1-10 (the "Count V Defendants").

342.    Alabama Code § 6-5-370 allows an injured party to commence a civil action for injury resulting from a felony.

343.    Mail fraud is a felony pursuant to 18 U.S.C. § 1341, wire fraud is a felony pursuant to 18 U.S.C. § 1343, and obtaining things of value under false pretenses is a felony under Alabama Code § 13A-8-2.

344.    The Count V Defendants have engaged in a pattern of acts as part of a scheme or artifice to defraud Plaintiff and to retain money by means of false and fraudulent pretenses and representations. In furtherance of and for the purpose of executing the above-described scheme or artifice to defraud, the Count V Defendants on numerous occasions used private or commercial carriers, or telephonic and facsimile transmissions across interstate commerce, constituting multiple acts of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

345.    The Count V Defendants transmitted in numerous mail and wire transmissions false and misleading information concerning the purpose, source, origin, and use of assets and funds. These representations were misrepresentations of material facts.

346.    The Count V Defendants made the above-described representations either willfully, with the intent to deceive while knowing that said representations were false, or made them recklessly.

347.    The Count V Defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to Plaintiff and other creditors.

348.     Plaintiff has been injured by the Count V Defendants' mail and wire fraud. Plaintiff has been injured in its business or property through its lost revenue in an amount to be proven at trial, because of Defendants' conduct.

WHEREFORE, Plaintiff requests that this Court enter judgment against the Count V Defendants including actual damages and lost revenue.

## COUNT VI
## ALABAMA FRAUDULENT TRANSFER ACT (ALA. CODE § 8-9A-1)
### (Actual Fraud)
**(Against Bill McKelvy, Janet McKelvy, GenFive, Craig Shaw, Mike Ward, Crystal McKelvy, BancorpSouth, JMW of Andalusia, Blackwater, and Square Donut)**

349.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 348 as if fully set forth herein.

350.     This Count is against Bill McKelvy, Janet McKelvy; GenFive, Craig Shaw, Mike Ward, Crystal McKelvy, BancorpSouth, JMW of Andalusia, Blackwater, and Square Donut (collectively, "Count VI Defendants").

351.     Plaintiff is a creditor of Bill and Janet McKelvy and was such at the time of the Fraudulent Transfers.

352.     The debts due from Bill and Janet McKelvy to Plaintiff arose prior to the Fraudulent Transfers.

353.     Bill and Janet McKelvy conveyed or directed the conveyance of the assets to the Count VI Defendants.

354.     Bill and Janet McKelvy were insolvent and indebted to Plaintiff at the time of the Fraudulent Transfers to the Count VI Defendants, or became insolvent following the Fraudulent Transfers as a result thereof.

368429.19

355.    At the time of the Fraudulent Transfers, Plaintiff sued Bill and Janet McKelvy.

356.    The Fraudulent Transfers to his children and grandchildren (via membership in GenFive), and to the Count VI Defendants were concealed from Plaintiff.

357.    Bill and Janet McKelvy made or directed the Fraudulent Transfers to the Count VI Defendants with full knowledge of the outstanding and unpaid debts to Plaintiff.

358.    Bill and Janet McKelvy made or directed the Fraudulent Transfers knowing that such conveyances would substantially reduce their assets and impair and impede Plaintiff in its efforts to obtain payment for their outstanding debts to Plaintiff.

359.    Bill and Janet McKelvy made or directed the Fraudulent Transfers to the Count VI Defendants without receiving a reasonably equivalent value in exchange for the transfer.

360.    The Count VI Defendants did not take, obtain or receive the Fraudulent Transfers in good faith.

361.    The Fraudulent Transfers were made with actual intent on the part of Bill and Janet McKelvy to hinder, delay, or defraud Plaintiff in its attempts to collect on the Judgments.

362.    Bank records and other accounting documents show that, while Bill and Janet McKelvy were indebted to Plaintiff, Bill and Janet McKelvy used GenFive Account to funnel money to the Count VI Defendants.

363.    Bill and Janet McKelvy fraudulently transferred the Assets to the Count VI Defendants in violation of the Alabama Uniform Fraudulent Transfer Act, Alabama Code §§ 8-9A-1, *et seq*.

364.    Plaintiff is entitled to an Order nullifying and voiding the Fraudulent Transfers, and declaring that title to and ownership of the assets that are the subject of the Fraudulent

Transfers remain with Bill and Janet McKelvy and/or is entitled to be included in a judgment against Bill and Janet McKelvy for the value of the assets that are the subject of the Fraudulent Transfers to the other Count VI Defendants or the amount necessary to satisfy the Judgments against Bill McKelvy, whichever is less.

365. Plaintiff is further entitled to an Order from the Court that Plaintiff may levy execution on the assets that are the subject of the Fraudulent Transfers to the Count VI Defendants or on their proceeds.

366. Pursuant to §8-9A-7, Plaintiff seeks injunctive and equitable remedies by requesting that this Court enter an order nullifying and voiding the fraudulent transfers.

367. Plaintiff seeks to prevent the Count VI Defendants from profiting from the cumulative fraudulent transfers which have and will continue to negatively impact Plaintiff, a valid judgment creditor.

368. Absent injunctive relief, the Count VI Defendants will undoubtedly move their money and assets to different bank accounts.

369. The Court should appoint a receiver pursuant to Federal Rule of Civil Procedure 66, 28 U.S.C. § 929, and/or its equitable powers to take charge of the assets that are the subject of the Fraudulent transfers and their proceeds and to take control of the affairs of Count VI Defendants.

370. Furthermore, as a result of the actions of Bill and Janet McKelvy in participating in the Fraudulent Transfers to the other Count VI Defendants, Plaintiff has suffered general damages and is entitled to recover from Bill and Janet McKelvy in an amount to be shown at trial.

368429.19

371.    As a result of Count VI Defendants' actions, Plaintiff has been forced to retain the services of counsel to prosecute this matter, and as such is entitled to an award of its costs and reasonable attorney's fees incurred.

WHEREFORE, Plaintiff demands an avoidance of any fraudulent transfer and/or an attachment against either the property transferred or other property of Bill and Janet McKelvy, for a writ of seizure and/or attachment on the GenFive Account, an injunction against further disposition of any property currently held by either McKelvy or Janet McKelvy, and such other and further relief as this Court may deem just and proper.

## COUNT VII
## ALABAMA FRAUDULENT TRANSFER ACT (ALA. CODE § 8-9A-1)
### (Constructive Fraud)
**(Against Bill McKelvy, Janet McKelvy, GenFive, Craig Shaw, Mike Ward, Crystal McKelvy, BancorpSouth, JMW of Andalusia, Blackwater, and Square Donut)**

372.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 371 as if fully set forth herein.

373.    This Count is against Defendants Bill McKelvy, Janet McKelvy, GenFive, Craig Shaw, Mike Ward, Crystal McKelvy, BancorpSouth, JMW of Andalusia, Blackwater, and Square Donut (collectively, "Count VII Defendants").

374.    Plaintiff is a creditor of Bill and Janet McKelvy, and was such at the time of the Fraudulent Transfers.

375.    Bill and Janet McKelvys' debts to Plaintiff arose before the Fraudulent Transfers, and said debts remained outstanding at the time of the Fraudulent Transfers.

368429.19

376.   Bill and Janet McKelvy made or directed the Fraudulent Transfers to the Count VII Defendants without receiving a reasonably equivalent value in exchange for the transfer.

377.   The Count VII Defendants did not obtain or receive the Fraudulent Transfers in good faith.

378.   Bill and Janet McKelvy were insolvent at the time of the Fraudulent Transfers to the Count VII Defendants, or became insolvent following the Fraudulent Transfers as a result thereof.

379.   Bill and Janet McKelvy made or directed the Fraudulent Transfers to the Count VII Defendants knowing that the Fraudulent Transfers would substantially reduce their assets and thereby impede and impair Plaintiff in its efforts to obtain satisfaction of their outstanding debts to Plaintiff.

380.   Bank records and other accounting documents show that, while Bill and Janet McKelvy were indebted to Plaintiff, Bill and Janet McKelvy used the GenFive Account to funnel money to the Count VII Defendants.

381.   Bill and Janet McKelvy made or directed the Fraudulent Transfers to the Count VII Defendants in violation of the Alabama Uniform Fraudulent Transfer Act, Alabama Code §§ 8-9A-1, *et seq.*

382.   Plaintiff is entitled to an Order nullifying and voiding the Fraudulent Transfers, and declaring that title to and ownership of the assets that are the subject of the Fraudulent Transfers remain with Bill and Janet McKelvy and/or is entitled to be included in a judgment against Bill and Janet McKelvy for the value of the assets that are the subject of the Fraudulent

Transfers to the other Count VII Defendants or the amount necessary to satisfy the Judgments against Bill and Janet McKelvy, whichever is less.

383.    Plaintiff is further entitled to an Order from the Court that Plaintiff may levy execution on the assets that are the subject of the Fraudulent Transfers to the Count VII Defendants or on their proceeds.

384.    Pursuant to §8-9A-7, Plaintiff seeks injunctive and equitable remedies by requesting that this Court enter an order nullifying and voiding the fraudulent transfers.

385.    Plaintiff seeks to prevent the Count VII Defendants from profiting from the cumulative fraudulent transfers which have and will continue to negatively impact Plaintiff, a valid judgment creditor.

386.    Absent injunctive relief, the Count VII Defendants will undoubtedly move their money and assets to different bank accounts.

387.    The Court should appoint a receiver pursuant to Federal Rule of Civil Procedure 66, 28 U.S.C. § 929, and/or its equitable powers to take charge of the assets that are the subject of the Fraudulent transfers and their proceeds and to take control of the affairs of Count VII Defendants.

388.    Furthermore, as a result of the actions of Bill McKelvy in participating in the Fraudulent Transfers to the other Count VII Defendants, Plaintiff has suffered general damages and is entitled to recover from Bill McKelvy in an amount to be shown at trial.

389.    As a result of Count VII Defendants' actions, Plaintiff has been forced to retain the services of counsel to prosecute this matter, and as such is entitled to an award of its costs and reasonable attorney's fees incurred.

368429.19

WHEREFORE, Plaintiff demands an avoidance of any fraudulent transfer and/or an attachment against either the property transferred or other property of Bill and Janet McKelvy, for a writ of seizure and/or attachment on the GenFive Account, an injunction against further disposition of any property currently held by either Bill McKelvy or Janet McKelvy, and such other and further relief as this Court may deem just and proper.

**COUNT VIII**
**CONSTRUCTIVE TRUST**
**(Against Bill McKelvy, Janet McKelvy, GenFive, Craig Shaw, Mike Ward, Crystal McKelvy, BancorpSouth, JMW of Andalusia, Blackwater, and Square Donut)**

390.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 389 as if fully set forth herein.

391.    This Count is against Defendants Bill McKelvy, Janet McKelvy; GenFive, Craig Shaw, Mike Ward, Crystal McKelvy, BancorpSouth, JMW of Andalusia, Blackwater, and Square Donut (collectively, "Count VIII Defendants").

392.    Plaintiff is a creditor of Bill McKelvy, and was such at the time of the Fraudulent Transfers.

393.    In the absence of the Fraudulent Transfers, Bill and Janet McKelvys' interests in the Fraudulent Transfers would have been available to Plaintiff to satisfy the Judgments.

394.    Bill and Janet McKelvy made the Fraudulent Transfers with the specific and fraudulent purpose of removing the Fraudulent Transfers from the reach of their creditors, including Plaintiff.

368429.19

395.   Even in the absence of fraud, it would be inequitable for the Count VIII Defendants, and Bill and Janet McKelvys' children and/or grandchildren (through their membership interest in GenFive) to retain their constructive interests in the Fraudulent Transfers given Bill and Janet McKelvys' outstanding obligations to Plaintiff at the time of the Fraudulent Transfers to the Count VIII Defendants .

396.   In light of the foregoing, this Court should impose a constructive trust on the children's and/or grandchildren's interests in GenFive, and the assets of Bill McKelvy, Janet McKelvy, Craig Shaw, Mike Ward, Crystal McKelvy, BancorpSouth, JMW of Andalusia, Blackwater, and Square Donut.

WHEREFORE, Plaintiff requests that the Court create an equitable, constructive trust with respect to the Count VIII Defendants' assets, including any property which was acquired in exchange for the Fraudulent Transfers, including any profit or enhancement of value thereon, for a writ of seizure and/or attachment on the GenFive Account and to award Plaintiff damages it has incurred from Counts I-VIII from the constructive trust.

## JURY DEMAND

First City Bank of Florida demands a jury trial for its claims herein.

368429.19

**PRAYER**

WHEREFORE, First City Bank of Florida respectfully requests that the Court enter the following judgments in favor of First City Bank of Florida, and against the Defendants named herein:

A.  Judgement for First City Bank of Florida against Defendants for all counts asserted herein;

B.  Writ of seizure and/or attachment on the GenFive Account;

C.  Temporary, preliminary and permanent injunctive relief enjoining the Defendants and each of their officers, agents, servants, employees, and attorneys—and all other persons who are in active concert or participation with these persons or entities—from transferring, liquidating, converting, encumbering, pledging, loaning, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, granting a lien, security interest, or other interest in, or otherwise disposing of, any assets, businesses, or funds, wherever located, that are: (a) owned controlled, held by, in whole or in part, for the benefit of, or subject to access by, or belonging to Defendants; (b) in the actual or constructive possession of Defendants, or (c) in the actual or constructive possession of, or owned, controlled, or held by, or subject to access by, or belonging to, any other corporation, partnership, trust, or any other entity directly or indirectly owned, managed or controlled by, or under common control with, any defendant, unless and until the judgment has been satisfied and the additional damages, fees, and costs awarded for this action have been satisfied;

D.  Temporary, preliminary and permanent equitable relief enjoining Defendants from undertaking any further conduct in furtherance of the unlawful scheme;

E.  The appointment of a receiver to take charge of the assets that have been transferred and to marshal and take control of the subject assets, accounts and corporations where it is believed Defendants have transferred and hidden William R. McKelvy and Janet F. McKelvy's assets and wealth;

F.  That each and every one of the transfers proven in this action be disregarded, and that Plaintiff be permitted to attach and levy execution upon the assets transferred in order to satisfy the amounts owed to Plaintiff;

G.  An award of actual and compensatory damages as available under the law, including without limitation, damages under the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. §1964;

368429.19

H.    Trebling of damages and reasonable attorney's fees incurred in prosecuting this action, pursuant to Title 18 U.S.C. § 1964(c);

I.    Punitive damages;

J.    Prejudgment interest and post-judgment interest on the outstanding judgment; and

K.    Such other, and further legal or equitable relief that the Court may deem just and proper.

Joel Connally
ASB No. 3751Y72J
Attorney for Plaintiff
First City Bank of Florida

OF COUNSEL:

STRENGTH & CONNALLY, LLC
7020 Fain Park Dr., Ste. 3
Montgomery, AL  36117
jc@strengthconnally.com
334-387-2121

368429.19

## VERIFICATION OF COMPLAINT

State of ___FLORIDA___,
County of ___Okaloosa___,

to wit: William H. Tinsley, Executive Vice President for the Complainant named in the foregoing Complaint being duly sworn, says that the facts and allegations contained therein are true, except so far as they are therein stated to be on information, and that, so far as they are therein stated to be on information, she/he believes them to be true.

_____

FIRST CITY BANK OF FLORIDA
William H. Tinsley, Executive Vice President
Complainant (signature)

Taken, sworn to and subscribed before me this _19th_ day of January 2017.

_____
Notary Public

```
           CYNTHIA A PARKER-MUNDHENK
   NOTARY   COMMISSION # FF173639
   PUBLIC   EXPIRES November 3, 2018
  STATE OF
   FLORIDA        BONDED THROUGH
              RLI INSURANCE COMPANY
```